FELDSTEIN ET UX. *v.* SEGALL ET UX.
SEGALL ET UX. *v.* FELDSTEIN ET UX.
(Two Appeals in One Record)

[No. 177, October Term, 1950.]

286

*Decided June 15, 1951.*

The cause was argued before MARBURY, C. J., and COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Charles J. Levey,* with whom was *S. Alfred Mund* on the brief, for the appellants.

*Donald N. Rothman,* with whom was *Simon E. Soberoff* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

These are cross-appeals from a decree enjoining defendants from obstructing (*1*) a ten foot right of way running south from Bank Street 195 feet to a fifteen foot right of way which runs east and west and leads into the ten foot right of way or (*2*) a thirteen foot, one-

quarter inch right of way bordering on the east side of the ten foot right of way and extending north from the fifteen foot right of way fifty-eight feet, six inches. This was a suit to establish the widening by prescription to twenty-four feet of a ten foot right of way granted by deed. By an amended bill plaintiffs narrowed their claim from twenty-four feet to twenty-three feet. By the final decree the court allowed plaintiffs' claim, to a width of twenty-three feet, one-quarter inch, as to the southernmost fifty-eight feet, six inches of the ten foot right of way, and disallowed it as to the northernmost 136 feet, six inches of the ten foot right of way. Plaintiffs' right to use, in common with others, the ten foot right of way and the fifteen foot right of way is not disputed. Defendants appeal from allowance of plaintiffs' claim to the extent of fifty-eight feet, six inches; plaintiffs appeal from disallowance of it to the extent of the remaining 136 feet, six inches.

The rights of way and other property involved in this case lie between Eastern Avenue on the south, Bank Street on the north, Eaton Street on the west and Grundy Street on the east, *i.e.*, in the same block as the property in *Perellis v. Baltimore,* 190 Md. 86, 57 A. 2d 341. The eastern end of the alley in that case was about thirty-four feet west of the west side of the ten foot alley in this case, with no connecting alley or way between them. There is no relation between that case and this and, except proximity of location and the fact that each case relates to a blind alley, no similarity between them.

In the early part of this century Henry Lammers acquired various properties in this block, which did not extend to, and had no outlet to, Eaton or Grundy Streets. In or shortly before 1918 he died. Under a decree dated November 1, 1918 these properties were sold and conveyed to various purchasers by John M. Requardt, the trustee named in the decree. Among these purchasers were Julius Miller and wife, defendants' predecessors in title, and Christian Habersack and wife, plaintiffs' predecessors in title. By a deed dated De-

cember 19, 1918 there was conveyed to the Millers the property Nos. 3904 and 3906 Eastern Avenue, beginning on Eastern Avenue, 284 feet, 10¾ inches east from Eaton Street, running east thirty-five feet, one inch on Eastern Avenue and north ninety feet "to a fifteen foot alley to be there laid out by the said Julius Miller and others interested therein * * *, it being also understood that an alley ten feet wide is to connect with said fifteen foot alley to be laid out * * * through the land of the late Henry Lammers to the north and which said alley shall run from Bank Street and connect with the said fifteen foot alley". By a deed dated March 12, 1919 there were conveyed to other purchasers, and by *mesne* conveyances of dates not shown to the Millers, among other properties, two on Bank Street beginning about 284 feet east of Eaton Street, running east on Bank Street eighty-two feet, ten and seven-eighths inches and south 195 feet to the fifteen foot alley, and one west of the ten foot alley, the end of the fifteen foot alley and Nos. 3904 and 3906 Eastern Avenue, but not extending north to Bank Street or south to Eastern Avenue, the western side of the ten foot alley being a northerly extension of the western boundary of Nos. 3904 and 3906 Eastern Avenue. Thus the south end of the ten foot alley and the west end of the fifteen foot alley meet at a right angle. The ten foot alley is the only outlet or inlet between the fifteen foot alley and any street. All these properties acquired, directly or by *mesne* conveyences, from Requardt, trustee, were conveyed by the Millers to defendants by deed dated July 11, 1944. The eastern boundary of the Bank Street properties is a northerly extension of the eastern boundary of No. 3912 Eastern Avenue, which does not appear to be owned by either plaintiffs or defendants. The Bank Street properties now owned by defendants, and Nos. 3904, 3906, 3908, 3910 and 3912 Eastern Avenue are apparently the only properties which were conveyed by deeds which call for, or give rights to use, the fifteen foot alley and its outlet the ten foot alley.

By a deed dated December 21, 1918 there were con-
veyed by Requardt, trustee, to the Habersacks the prop-
erties Nos. 3908 and 3910 Eastern Avenue, adjoining
on the east Nos. 3904 and 3906, running east forty-nine
feet on Eastern Avenue and north ninety feet to the
fifteen foot alley, "with the use of both of said alleys
in common", (the fifteen foot alley and the ten foot
alley). On June 23, 1919 the Habersacks leased No.
3910, for a thirty-nine dollar ground rent, to their
daughter and son-in-law, John T. Croucher. By a deed
dated January 3, 1946 the Habersacks and the Crouchers
conveyed Nos. 3908 and 3910 to plaintiffs, with the use
of both of the alleys, extinguishing the thirty-nine dollar
ground rent.

In 1918 Eastern Avenue was principally a residence
street and was not, as it now is, "a heavily congested
traffic artery". *Perellis v. Baltimore, supra,* 190 Md. 86,
90, 57 A. 2d 343. As the original Miller deed shows, the
fifteen foot alley and the ten foot alley did not exist
until the Lammers property was sold, and thereby
divided, and the alleys were called for in the deeds.
The Lammers property north of the fifteen foot alley
was not improved or enclosed. Apparently, the only
improvements now there are a concrete block of garages,
behind No. 3912 Eastern Avenue, about nineteen feet
deep, extending north about sixty-eight feet and another
block of such garages, a little deeper, extending the same
distance north, facing the ten foot alley, about twenty-
three feet, one-fourth inch east of the western side of
that alley. On defendants' property west of the fifteen
foot alley and the ten foot alley is a third block of
garages, facing on or near the western boundary of
the ten foot alley. The property north of the fifteen
foot alley is now (*i.e.,* in 1947) enclosed on the north
and east by a "new cyclone fence". For a little less than
twenty-three feet east from the northwestern corner
on Bank Street there is, in place of the curbstone which
runs east on Bank Street, rounded off concrete which
permits vehicles to cross a concrete sidewalk into or out

of the property to the south. There are gates in the fence which open at this twenty-three feet. Who made the break in the curbstone is not shown, but the obvious inference is that Miller did. The twenty-three feet west of the second block of garages is paved with concrete for fifty-eight feet, six inches north of the fifteen foot alley. No other part of the ten foot alley or the twenty-three foot right of way claimed by plaintiffs has been paved. The northern part of the claimed thirteen foot right of way is a beaten way and has been macadamized to the extent of spreading some small stones there. The northern part of the ten foot alley apparently has never been used at its true location. It is hilly, its maximum height about two feet, six inches above the yard. Things which have grown or have been thrown there reach a greater height. It has not been graded. There is no apparent obstacle to grading except the expense, which presumably would not be large.

The garages on the property north of the fifteen foot alley and the break in the curbstone on Bank Street were in existence "before 1927". When that property was first enclosed does not appear; evidently it was some years after 1918. Mrs. Goldie Mannes, thirty years old (in 1950), was born at 3904-3906 Eastern Avenue and lived there until 1944. As a child, she and other children played on the lot south of Bank Street. The lot was not fenced in; it was open. She saw vehicular traffic on the lot; saw automobiles and trucks parked there; saw people other than her father's [Miller] tenants use it. Mr. Croucher drove his automobiles back there; he was all over the place, he did not drive just in one straight line. We cannot assume that this testimony related to only the first seven years of her life.

Early use of the northern lot or the ten foot alley comprised miscellaneous uses of an open lot which had little or no relation to the original purpose and the present use of the alley as an inlet and outlet for vehicular traffic to and from the Eastern Avenue properties that bordered on the fifteen foot alley. For many years a

barrel or cooperage shop has been operated on the lot; just where and in what building is not shown. Most of the early traffic between Bank Street and Eastern Avenue was not vehicular, but pedestrian. Nos. 3904-3906 Eastern Avenue was described as running east on Eastern Avenue "to the west side of a covered alley there situate * * * with the use of said covered alley in common". This "covered alley" was part of the fifteen foot frontage of No. 3908 on Eastern Avenue. Mr. Croucher says, "Lots of people made use of it ["that way", the ten foot alley], came through there at times. People used to come through there and go through my back entrance to go to Eastern Avenue. Of course I had a gate there. Lots of times the lock was broken off the gate to get through. I had three gates there, a gate in front of the home, a gate at a twenty foot alley [?], and a gate at the end of the fence. They were torn off lots of times."

Vehicular use by Mr. Croucher, or by others seen by him, of the northern lot or the "ten foot alley" had little more relation to the original purpose or the present use of the alley. He says, "I used it ["that way"] from the time I lived there clean until I moved. I had vegetables there, and I had a truck come up and gather them and take them away. * * * I used that practically every day." "* * *, we had a man lived next door to me had a truck. He pulls up in there." Mr. Croucher rented a garage on the lot. He never had "a tractor or trailer units" deliver any merchandise to his home. The cesspool cleaners came in through the lot. Mr. Croucher "most of the time" had his coal delivered through the front of his house; if he could not get it in the front—if it was blocked up, it was run in the back.

Plaintiffs conduct a hardware store on their property. For about twelve years before their purchase they were tenants of No. 3912 and there conducted the same or a similar business. After their purchase they built a new building with a loading and unloading platform at the fifteen foot alley. Defendants say in their answer,

but offer no evidence to show, that the platform in fact encroaches on the fifteen foot alley. Plaintiffs say that for sixteen years they have without objection received merchandise and made deliveries to customers by trucks through their claimed twenty-three foot right of way and the fifteen foot alley, that many of the trucks are too large to turn from a ten foot alley into a fifteen foot alley, or *vice versa,* or to turn around in alleys of that size, and that use of the twenty-three foot right of way is therefore essential for these purposes. In 1947 defendants placed and locked gates across the twenty-three foot entrance on Bank Street. On demand of plaintiffs they unlocked the gates, but they erected one or more posts marking the boundary of the ten foot alley at the fifteen foot alley. This, plaintiffs say, prevented use of the alley by their own trucks or the trucks that bring them merchandise. This suit was then brought and plaintiffs obtained a preliminary injunction against obstruction of their "twenty-four foot right of way". When the amended bill was filed in 1950 the injunction was modified so as to cover only a twenty-three foot right of way.

The decree below recites that it was "the judgment of the court that the * * * plaintiffs have acquired an easement [over the thirteen foot, one-fourth inch right of way], both by necessity and by continuous adverse usage." In an accompanying memorandum the court said, "The court does not feel that the plaintiff has established a grant of easement to the fifteen foot right of way claimed [?], but does feel that there has been established an easement both by necessity and by continuous adverse usage in the rear portion of the thirteen foot strip of ground which has been used by the plaintiffs for access to the rear of their property."

In the absence of more definite indication of the trial judge's view of the facts, there is no opportunity for application of the rule that the decision of the judge who has seen and heard the witnesses, on questions of fact, will not be reversed unless clearly wrong. In this

case there is little room for questions of veracity. The judge's views are expressed on mixed questions of law and fact. The real question is the legal effect of miscellaneous facts not sharply disputed.

No question of jurisdiction in equity was raised here or below. Any such question is therefore waived. *Weeks v. Lewis*, 189 Md. 424, 426, 56 A. 2d 46; *Bogley v. Barber*, 194 Md. 632, 641, 72 A. 2d 17, 21.

An easement cannot be established both by necessity and by prescription. If it is established by necessity, it cannot be established again by prescription. If a way of necessity is not implied in the grant, it cannot be established by any subsequent necessity. In *Condry v. Laurie*, 184 Md. 317, 41 A. 2d 66, the court and the dissenting judges differed as to how far necessity is the legal basis of a way of necessity and how far it is evidence of an implied intent to grant such a way. The court held that a personal license in the deed did not negative a way of necessity. The occasion for using the way of necessity was deferred until expiration of the personal license, but the necessity of the way to the granted estate existed at the time of the grant. See also Case note, 9 Md. L. Rev. 84.

Plaintiffs contend that in determining whether or not they have established a widened right of way by prescription, their own use since 1946 may be tacked to the use by their predecessors in title, Habersack and Croucher, and that what was said to the contrary in *Hansel v. Collins*, 180 Md. 209, 23 A. 2d 686, was not necessary to the decision in that case, and is unsound on principle and on authority in most jurisdictions. We do not find it necessary to pass upon this contention. If Habersack and Croucher, at the time of their deed to plaintiffs, had by prescription acquired a consummate right of way, their deed, and the appurtenance clause in it, is sufficient to convey such a right of way. If at the time of their deed, they had not acquired a prescriptive right of way, tacking plaintiffs' use from January, 1946 to September, 1947 would not establish such a right of way. If the

evidence does not show adverse, exclusive and continuous use for twenty years before January, 1946, then there is no evidence to show such use for twenty years before September, 1947. It is not suggested that plaintiffs' use, as owners of Nos. 3908 and 3910 could be tacked to their previous use as tenants of No. 3912. . If these uses could be tacked they would cover only sixteen years.

We need not repeat what we recently said in *Wilson .v. Waters,* 192 Md. 221, 64 A. 2d 135, regarding establishment of an easement by prescription. That case and the earlier case of *Cox v. Forrest,* 60 Md. 74, state the law as favorably as the claimant of such an easement can expect. The instant case, however, is sufficiently different on the facts from those cases, not to make the law there stated inapplicable, but to require stronger evidence of adverse, continuous and exclusive use than we find before us. We need not say, as has been said of unenclosed woodland or other unenclosed or unimproved land (*Wilson v. Waters, supra,* 192 Md. 221, 228, 64 A. 2d 138; *Tiffany* on *Real Property* (3d Ed.), § 1196 (a), that use of the Lammers land, while unenclosed, is presumed to have been permissive or not adverse. But plaintiffs' evidence shows that use of the unenclosed Lammers land was so miscellaneous and promiscuous that it could not be called either adverse or exclusive. *Cf. Lindokken v. Paulson,* 224 Wisc. 470, 272 N. W. 453, 110 A. L. R. 910, and note 110 A. L. R. 915. The only adverse use indicated by Croucher's testimony is not use by him of the open lot, but use of his Eastern Avenue property by pedestrians acting as hardly more than tramps. Nor is there evidence that the Lammers lot was enclosed or such miscellaneous and promiscuous use became adverse and exclusive within twenty years of January, 1946 or September, 1947.

It may be assumed that a widened right of way, no less than a new one, may be acquired by prescription. But use originally permissive or of right is presumed to continue, and there must be affirmative evidence of change to adverse use. A statute was necessary to make

cessation of payment of rent evidence of adverse possession, *Safe Deposit and Trust Company v. Marburg,* 110 Md. 410, 413-417, 72 A. 839—just as a statute had been necessary to permit proof of possession without actual enclosure. Code, Art. 75, sec. 84; *Poe* on *Pleading,* (5th Ed.) §§ 265, 266, 267. Miller was not only the owner of the entire lot north of the fifteen foot alley and of property west, but also of Nos. 3904-3906 immediately south of that alley. Owners of Nos. 3908, 3910 and 3912 also had the right to use the two alleys. So long as neither they nor Miller cared to incur the expense of grading the ten foot alley, and Miller was willing to permit them to use, for pedestrian or vehicular traffic, land east of the alley, such use was not adverse and did not prevent Miller from revoking such permission when he saw fit. It did not create in them a prescriptive right of way in addition to the ten foot alley not used by them at its true location. So long as such permission was not abused it was a matter of indifference to Miller whether their vehicles passed over the west or the east side of the open space between his two blocks of garages. The fact that their vehicles did not follow "one straight line" did not double the width of their right of way. To acquire title by adverse possession to one's neighbor's property the evidence must show something more than bad manners and unneighborly conduct.

A right of way of prescribed width does not grow with the size of trucks or other automobiles. If tautology could clarify the plain words "ten foot alley", it is at least obvious that rights in a ten foot alley do not include use of automobiles too large for a ten foot alley. We cannot take judicial notice of the annals of trucks or of catalogues of the makes and sizes in use from year to year. We know there are now trucks and tractor-trailers too large to turn from a ten foot alley into a fifteen foot alley, or *vice versa.* Whether there were any such in 1918 we do not know; if there were, plaintiffs' predecessors in title had no right to use them in these alleys. If it is too much to say that we infer from the evidence,

we at least strongly suspect, that use of oversize trucks did not occur until plaintiffs acquired their property and erected their new building and their loading and unloading platform. There is no affirmative evidence of any prior use. On the whole, the evidence tends to support defendants' position that they were tolerant of plaintiffs' use of their property until plaintiffs began to take unneighborly advantage of their tolerance by practically taking possession by huge trucks of defendants' entire space between their two blocks of garages.

At the argument plaintiffs stressed the fact that the opening in the curbstone on Bank Street is twenty-three feet wide. Inasmuch as Miller was the owner of the Bank Street lot as well as one of those entitled to use of the ten foot alley, this fact is of no significance. Miller could use his property as he chose. If for his purposes he widened the ten foot alley, this would not necessarily confer any rights on plaintiffs' predecessors.

Neither plaintiffs nor defendants have claimed that there has been a relocation of the ten foot alley by use, estoppel or express or implied agreement. *Weeks v. Lewis*, 189 Md. 424, 427-428, 56 A. 2d 46; *Greenwalt v. McCardell*, 178 Md. 132, 12 A. 2d 522. No such question has been considered by us. Plaintiffs' only contention is that they have acquired by prescription a thirteen foot right of way in addition to the ten foot alley. This contention cannot be sustained.

As defendants have not contested plaintiffs' right to use the ten foot alley, there was and is no ground for injunction against obstruction of the alley.

Appellees have moved to dismiss appellants' appeal on the ground that the clerk of the lower court, in receiving on the last day for appeal appellants' "order for appeal" unaccompanied by an admission or proof of service, violated Rule 1 (a) (2) of Part Two V of the General Rules of Practice and Procedure, which is: "Whenever filing of any pleading, notice or other similar paper (except the declaration, bill of complaint or other original pleading) is required or permitted,

such pleading, notice or other similar paper shall not be received and filed by the Clerk of the Court unless accompanied by an admission or proof of service of a copy thereof upon the opposite party or his attorney of record in accordance with this rule." Code, 1947 Supp., p. 2046-2047. The question is whether an "order for appeal" is a "pleading, notice or other similar paper". Rule 1 (a) (1) provides, "Every pleading, notice or other similar paper (except the declaration, bill of complaint or other original pleading) shall be in writing and shall be served upon the party to be affected by it, or his attorney of record in accordance with this rule except where pleading is permitted orally in open court." 1947 Supp., p. 2046. The short, somewhat technical answer is that an appeal may be taken orally, without any written "order for appeal", the appellant taking the risk that the clerk may fail to "enter" the appeal. Code, Art. 5, sec. 1; *Miller v. Murray,* 71 Md. 61, 17 A. 939; *Poe* on *Practice,* § 823. Moreover, from a broader point of view, "pleading, notice or other similar paper" is applicable to proceedings in the lower court and not to an "order for appeal", which after final judgment or decree in the lower court in effect removes the case to this court. As this court now has power to make rules for trial courts as well as for appeals, the rules for appeals, the equity rules and the general rules of practice and procedure should properly be construed together. Nevertheless the long history of the rules for appeals and the very different history of the general rules of practice and procedure should not be ignored in a quest for factitious verbal unity. The motion to dismiss is denied.

*Decree reversed, with costs, and bill dismissed.*