REGINALD FLETCHER *v.* HIGH'S DAIRY
PRODUCTS DIVISION OF CAPITAL
MILK PRODUCERS CO-OPERA-
TIVE, INC.

[No. 712, September Term, 1973.]

*Decided July 12, 1974.*

The cause was argued before MORTON, MOYLAN and MOORE,
JJ.

*George Molnar* for appellant.

*Francis X. Quinn* for appellee.

MOORE, J., delivered the opinion of the Court.

Appellant prevailed below on one count of a four-count declaration alleging false arrest, slander, invasion of privacy and malicious prosecution on the part of the corporate appellee-defendant. After a nonjury trial, he was awarded damages in the sum of $1200.00.[1] His complaint here is that the amount of damages was paltry indeed and that the court also erred in finding for the defendant on the counts of false arrest and slander.[2]

Appellee, in a cross appeal, contends that the trial court correctly found for the defendant at the conclusion of the trial and should not thereafter have reversed itself and entered a judgment for the appellant.[3]

I

What befell the appellant on the evening of January 13, 1970 in the hours after he entered High's Dairy Store on Ohio Avenue in Landover to buy luncheon meat for the next day is not in dispute. As he entered the store he noticed that there was "a commotion going on" involving some young boys and the lone store attendant (with whom appellant was acquainted). Appellant made his purchases and returned home to drop them off before driving into the District of Columbia to visit a friend. When he came back home about one hour later, he was informed by his wife that in the

---

1. The declaration failed to elect a jury trial and a subsequent motion by the appellant to place the case on the jury calendar was denied.

2. Appellant's brief incorrectly states that the damages were awarded for false imprisonment. In making the award of damages, the court did not refer to any count but did state that the sum awarded would adequately compensate "for the inconvenience of going to court." Clearly, the award was for malicious prosecution.

3. As noted *infra*, appellee filed separate appeals on October 29, 1973, from the court's judgment for appellant dated August 6, 1973 and the court's order dated October 23, 1973 denying appellee's motion to vacate the judgment; and although not challenged by appellant, the cross appeal from the judgment was untimely.

meantime the police had been there with a warrant for his arrest.

He revisited High's where he met Arnold Freeman, whom he knew as the manager of the store, but who had not been on the premises when appellant was there earlier. Freeman at first would not respond to appellant's demand to know "what was going on," but then

> "[h]e said that I [appellant] put my boys on his store and he said that he was going to make an example out of somebody and I was the chosen one, and I asked him what do he mean by me putting my boys on the store, and he refused to answer to anything else. He said 'I am not going to say anything more. I am going to do something about this.'"

Appellant presented no evidence to show that these utterances were made in the presence of anyone but himself. His testimony as to the presence of third persons related entirely to his initial visit to the store earlier in the evening.

Appellant testified that he declined "to argue" with Freeman further. He went directly on his own to police headquarters in Seat Pleasant. There he was given the warrant, which had been sworn out by Freeman, and was charged with shoplifting. He was fingerprinted and photographed. Bail was set at $100, which he was unable to make until the next morning in court, with the result that he spent the night of January 13 in jail. On March 16, 1970 he was tried in the People's Court of Prince George's County and was acquitted. The complaining witness, Freeman, did not appear at trial, a communication from the People's Court to him in care of the High's store having previously been returned with the notation "address unknown; no longer employed at this address per High's store." [4]

At the trial below appellant said that his occupation was interior decorating, that for two or three years prior to January 13 he had worked as a "partner" with a Mr. Marks

---

4. Freeman had been dismissed from the employ of High's on January 29, 1970, according to the testimony of Mr. Melvin Wynes, *see infra.*

doing "all kinds of work, painting, paneling, floor tiling," that at the time of his arrest he "was making . . . anywheres from $300. I come to make $500 a week;" that following the arrest Mr. Marks "refused me work altogether," and that he then remained unemployed for from four to five months until enrolling in a public assistance program ("WIN"). He also entered in evidence a bill for $250 for attorney's fees in connection with his trial in the People's Court for Prince George's County. On cross-examination he conceded saying in his deposition that he had been enrolled in WIN, a program which evidently provided public assistance and "a certain subsidy" for attending school, "almost since January of 1970," *i.e.*, at about the time of the High's incident, and that he could not "put any dollar figure" on wages lost on account of the arrest; he further testified that he had no record of his income during the period of his employment with Mr. Marks because his house had burned down shortly after the incident. With respect to his conversation with Mr. Freeman he admitted characterizing it in his deposition as follows:

> "It was like a thing, he was mad. He was more mad than anybody I have ever seen in my life . . . and it was like the first person that came in, it was like this man is against them, you know, the first person that would enter the store. . . ."

The appellee called two witnesses, Melvin Wynes, Sr., District Supervisor for High's Dairy Products with jurisdiction over the Ohio Avenue store, and Joe Henry Taylor, Area Manager for High's and Mr. Wynes' immediate supervisor. Both testified as to the authority of store managers to swear out arrest warrants. Mr. Taylor stated:

> "We have a stated policy that no employee will make or swear out a warrant unless he checks with his supervisor first and he in turn will come to me, then that decision remains my decision. . . ."

Neither Mr. Wynes nor Mr. Taylor became aware of the warrant sworn out by Mr. Freeman until the present proceedings were brought.

## II

It is perfectly clear from the record that there was no evidence to support appellant's claims for slander and false arrest and that, therefore, to say the least, the court was not clearly in error in determining that appellant's evidence was insufficient on these counts. Rule 1086. Appellant claims as defamatory Freeman's accusation made to him in the store that he had "put my boys on his store." Even assuming his position is valid, it is elementary that defamation requires a publication, a communication to one other than the plaintiff. Prosser, *Law of Torts*, § 111, p. 737 (1971 ed.); *Geraghty v. Suburban Trust Company*, 238 Md. 197, 208 A. 2d 606 (1965). Appellant offered no evidence to show such a communication and therefore failed his burden of proof.

There was a similar absence of evidence to sustain the false arrest claim. Appellant was not detained until he had voluntarily gone to the police station and was placed under arrest. Thus any liability of High's on the theory of *respondeat superior* must be based solely on the report which Freeman gave the police. A private person does not become liable for false arrest, however, when he provides information, even mistaken information, to lawful authorities, even though that information is the principal cause of another's imprisonment. The remedy in such cases, if any, is an action for malicious prosecution. A different rule obtains and liability may attach if he knowingly gave false information to an arresting officer. *Newton v. Spence*, 20 Md. App. 126, 316 A. 2d 837 (1974), and authorities there cited, pp. 135-6. Appellant offered no evidence to show that Freeman deliberately gave false information to the police; indeed such evidence, as tending to show personal animus on Freeman's part toward appellant, would have run directly athwart appellant's contention that Freeman was acting within the scope of his employment and in believed furtherance of his employer's interests in lodging the complaint with the police.

Finally, with respect to the award of $1200 damages, appellant's lament is simply that "there are numerous judgments handed down almost daily in this area of tort that dwarf the judgment herein."

Ordinarily the question whether the verdict is excessive or inadequate is not a matter for appellate review. *Abraham v. Moler*, 253 Md. 215, 252 A. 2d 68 (1969); *Rephann v. Armstrong*, 217 Md. 90, 93, 141 A. 2d 525 (1958); *Riley v. Naylor*, 179 Md. 1, 16 A. 2d 857 (1940). At all events, the record amply supports the conclusion of the trial court that $1200 would "adequately compensate" appellant. The court was frankly skeptical, and justifiably so, of his claim to lost wages amounting to between $300 and $500 a week, wondering indeed whether appellant met "the requirements that he was ever employed by this fellow [Marks]" and finding that he "was on a government training program [WIN] making a substantial amount of money" at the time of the High's incident and thereafter. We could not say the verdict was insufficient even if its review were appropriate.

### III

In its brief appellee states:

> "High's appeals both the Court's ruling of August 6, 1973 entering judgment for Fletcher and the Court's denial of its Motion to Vacate Judgment For Plaintiff and Reinstate Judgment for Defendant."

The *imbroglio* which gave rise to this cross-appeal began when the court, at the conclusion of the trial, on June 29, 1973, entered judgment nisi in favor of the appellee on all counts. Subsequently, appellant moved for a new trial. In open court on August 6, 1973, the motion was denied but the court reversed itself on the question of agency *vel non* of the employee Freeman, granted a verdict for the plaintiff [appellant] and assessed damages. On August 31, 1973 counsel for appellant filed a timely appeal to this Court. Although the "Praecipe" on which the appeal was entered bore the notation "Copy mailed to: Francis Quinn, 22 W. Jefferson St., Rockville, Md. [counsel for appellee]," it appears that Mr. Quinn did not receive it. Unaware of the pendency of the appeal, he filed a "Motion to Vacate Judgement for Plaintiff and Reinstate Judgment for Defendant" in the Circuit Court on September 4, 1973,

within the time otherwise permitted for filing such a motion. This motion was set for hearing and on October 24, 1973 the court filed a memorandum opinion and order, ruling that it lacked authority to consider the motion once appellant had entered his appeal. Thereupon, on October 29, 1973 appellee filed two separate notices of appeal — one from the judgment of August 6 and the other from the Order of October 23.

The first is plainly untimely. Rule 1012. Appellee contends in its brief, however, that either this Court should consider the merits of his dissatisfaction with the judgment of August 6 or that "the trial court should have the opportunity to exercise revisory power over its judgment." This plaintive argument is based, ultimately, on the fact that appellant's failure to serve counsel with notice of the appeal deprived him of the opportunity to file a timely cross appeal. Appellee concedes that "in the normal situation the appellate court has exclusive jurisdiction once an appeal has been perfected," but asserts that "this should not be the rule here" because of the failure of notice. Indeed, it maintains, Md. Rule 306, Service of Pleadings and Other Papers, "prescribes" such notice as a condition to a valid appeal.

The phrase "pleading, notice or other paper" in Rule 306 "is applicable to proceedings in the lower court and not to an 'order for appeal' . . . ." *Feldstein v. Segall*, 198 Md. 285, 81 A. 2d 610 (1951).[5] In *Feldstein* the Court of Appeals explained:

> ". . . the rules for appeals, the equity rules and the general rules of practice and procedure should properly be construed together. Nevertheless the long history of the rules for appeals and the very different history of the general rules of practice and procedure should not be ignored in a quest for factitious verbal unity."

Very recently, however, there has been adopted by the Court of Appeals a recommendation of the Standing Committee on

---

5. Construing the predecessor to Rule 306 a 1, Rule 1(a)(1) of Part Two V of the then General Rules of Practice and Procedure.

Rules of Practice and Procedure proposing an amendment to Rule 1011, How Appeal to Be Taken [to the Court of Special Appeals], providing in part:

> "A copy of the order for appeal shall be served upon all other parties in the manner prescribed by Section c of Rule 306 (Service of Pleadings and Other Papers) and proof of such service shall be made in the manner prescribed by section d of Rule 306 (Service of Pleadings and Other Papers)." [6]

One salutary effect of the amendment shall be the prevention of an inequity such as appellee contends has arisen here. *See* Rule 306 a 2. In the present circumstances, the appeal having been perfected, the rule obtains that this Court is vested with exclusive power and jurisdiction over the subject matter of the proceedings, and the authority and control of the lower court with reference thereto are suspended. This rule permits of no exception because notice of the appeal was not received by the appellee. *Tiller v. Elfenbein,* 205 Md. 14, 106 A. 2d 42 (1954); *Bullock v. Director,* 231 Md. 629, 190 A. 2d 789 (1963); *Visnich v. Wash. Sub. San. Comm.,* 226 Md. 589, 174 A. 2d 718 (1961); *Callahan v. Dean,* 17 Md. App. 67 (1973).

Were we presented with different facts, therefore, we might agree that appellee has indeed suffered an inequity, his cross appeal from the judgment of August 6 having come too late. But it is perfectly clear to us that the cross appeal could not be sustained on the merits in any event. Its sole contention as to the malicious prosecution count is that there was no prima facie showing that Freeman "was acting within the scope of his agency and/or employment" in instituting proceedings. That question as a rule is properly left for determination by the finder of fact. *Newton v. Spence, supra,* and cases cited. Here the trial judge stated:

> "It would appear, however, that the act was

---

6. *See,* Recommendations, Standing Committee on Rules of Practice and Procedure, Part II, published in The Daily Record, June 12, 1974, adopted by the Court of Appeals on July 1, 1974.

initiated by the manager in, at least, his employee capacity, if not his managerial capacity; and the intent of the act was for the final result to inure to the benefit of the defendant company, to prevent shoplifting.

"There is no evidence to indicate that this was a case of the manager trying to satisfy some wicked and malicious purpose of his own. The evidence would indicate that the manager was, if anything, apparently making an example out of the plaintiff for the purpose of discouraging such repetitive conduct in his store in the past and for the future.

"The defendant company argues that the manager was not authorized and, indeed, even forbidden from having persons arrested for conduct such as the plaintiff had been accused. Such arguments are to no avail, however, since the case law is well established that the master is liable for the tortious acts of his servants. And citing one of the cases in the Maryland Appellate Court, *N.Y.P. & N.R.R. Company v. Waldron*, 116 Md. 441 [82 A. 709], the Court, at Page 452, stated as follows:

'. . . the defendant company is liable for the acts of its conductor in ordering and procuring the arrest and imprisonment of the plaintiff which were committed in the course of his employment, even though he was not authorized to do so by the defendant company. . . .' "

We could not say that the court erred as a matter of law in this conclusion. Rule 1086.

*Judgment affirmed; costs to be paid by appellant.*