Agnes A. REAVES

v.

WESTINGHOUSE ELECTRIC CORPORATION.

Civ. No. JFM–85–295.

United States District Court, D. Maryland.

March 3, 1988.

William H. Engelman, Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A., Baltimore, Md., for plaintiff.

Donald E. Sharpe, F. Ford Loker, Jr., Whiteford, Taylor & Preston, Baltimore, Md., for defendant.

## MEMORANDUM

MOTZ, District Judge.

Plaintiff, Agnes A. Reaves, instituted this suit against defendants, Westinghouse Electric Corporation and Richard A. Fuselier, in the Circuit Court of Baltimore City. Defendants filed a petition for removal to the Court, and they have now—after the completion of discovery—moved for sum-

mary judgment as to the claims asserted against them.[1]

## FACTS

In late 1982 or early 1983, Westinghouse learned that one of its employees had been manipulating its purchasing procedures to embezzle money and other property. This employee was fired, charged with theft, convicted, and sentenced to three years probation and a requirement that he make restitution. Subsequently, Westinghouse, through Harold Renninger, its manager of employment relations, undertook a broad investigation of the use of disbursement receipts, including so-called "blue slips," which were used to request reimbursement for out-of-pocket expenses not greater than one hundred dollars. This investigation detected a high volume of blue slips being generated by the Technical Training Operations ("TTO") department in Westinghouse's Columbia facility. In addition, many of these blue slips had been altered to reflect a greater quantity of goods than was actually purchased and a higher price than was actually paid. Westinghouse officials met with the manager of the Columbia facility, who could not explain the alterations. They then met with defendant Fuselier, the head of "TTO", to seek an explanation for the altered blue slips, which Fuselier and plaintiff Reaves both had signed.

Here, the parties' versions of the facts diverges. According to Westinghouse, Fuselier could not explain the alterations in the blue slips. He did, however, explain the unusual quantity of them generated by TTO. Fuselier stated that the employees at TTO, in order to avoid the bureaucracy of ordering supplies through standard channels, had adopted the practice of making purchases with their own funds and seeking reimbursement. To avoid the blue slip limit of one hundred dollars, the employees would have the seller issue multi-ple receipts. For his part in this plan, Fuselier was subsequently demoted one "code". (The precise effects of this demotion upon Fuselier are unclear).

Westinghouse's investigation then moved on to plaintiff Reaves. On July 21, 1983, Reaves met with the manager of the Columbia facility. At that meeting, in the presence of Fuselier and other employees, Reaves was accused of altering the blue slips for her own benefit. Reaves said nothing in response. She alleges that she looked fruitlessly at Fuselier in hopes that he would explain the situation. According to Reaves, contrary to Fuselier's contention that he knew nothing of the alteration of the blue slips, Fuselier and his subordinates, all of whom were Reaves' superiors, ordered Reaves not only to circumvent normal purchasing procedures as noted above but also to alter the receipts. At the conclusion of the meeting, Reaves was suspended without pay pending an investigation and an audit. Soon after this meeting, Westinghouse requested that Fuselier describe, in writing, Westinghouse's procurement procedures and his explanation for the pervasive abuse of the blue slips at TTO. In response, Fuselier submitted a "position paper," dated August 15, 1983, in which Fuselier accused Reaves of criminal fraud and in which he stated that he was unaware of Reaves' fraudulent activities.

At approximately this time Reaves—who is black—filed a charge of race and sex discrimination with the Equal Employment Opportunity Commission and the Maryland Commission on Human Relations, challenging her suspension. She alleged that she had acted under the direct orders of her male white supervisors and that, notwithstanding the fact that they were at least as culpable as she, she was the only person suspended.[2]

Westinghouse's investigation, which continued until August 29, 1983, revealed that, over a three year period prior to July 1983,

---

**1.** Westinghouse has counterclaimed against Reaves for $63,447.20. No motion with respect to that counterclaim has been filed.

**2.** On September 2, 1983, several days after she was discharged, Reaves filed amended charges with the EEOC and MCHR, contending that her termination was the result of unlawful race and sex discrimination. The record does not reflect the disposition of those charges.

Reaves had obtained $63,537.20 through the submission of over 1300 fraudulent blue slips. On August 29, 1983, Reaves was fired after having been employed with Westinghouse for over twenty years.

Subsequently, Renninger (on behalf of Westinghouse) turned over to the Howard County police the information that had been gathered during the investigation. Detective Jones of the Howard County Police Department determined that there was probable cause to believe that Reaves had committed theft, and he applied for and received a warrant for her arrest. Subsequently, the grand jury returned an indictment against Reaves, charging her with two counts of felony theft.

Reaves was tried in the Circuit Court of Howard County. At trial, she admitted having altered the blue slips, but she claimed that she acted in accordance with the instructions of her superiors, including Fuselier. She produced at least three witnesses who testified that others also had altered blue slips to raise money. These three witnesses stated that they understood that the funds so obtained would go into the Christmas fund. Reaves contends that this testimony establishes that Westinghouse had knowledge of the practice. However, none of these witnesses stated with any certainty that Fuselier knew of, ordered or approved the practice. The only supervisor to whom any of these witnesses attributed knowledge of the practice was a Mr. Ketteringham who did not attend any of the meetings during Westinghouse's investigation.

Reaves was acquitted on October 22, 1984 and subsequently filed the instant suit.

## DISCUSSION

Reaves asserts a claim for employment discrimination under 42 U.S.C. Section 1981 (1982). She also asserts state law claims for malicious prosecution, false arrest, defamation and intentional infliction of emotional distress.[3]

### Malicious Prosecution

■ One of the elements of a claim of malicious prosecution is the absence of probable cause for the criminal proceeding which is instituted. *See, e.g., Exxon Corp. v. Kelly,* 281 Md. 689, 693, 381 A.2d 1146, 1149 (1978); *Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 173, 122 A.2d 457, 460 (1956). To the extent that Reaves is asserting an independent claim against Westinghouse, i.e., a claim not asserted under the doctrine of *respondeat superior* as Fuselier's employer, this claim fails as to this element of probable cause. At the time that the criminal charges were filed, Westinghouse had strong evidence that Reaves had altered blue slips to reflect over $60,000 of purchases that never were made. This evidence alone established what has been called a "threshold of probable cause," and once that threshold was established Westinghouse was under no obligation to conduct further investigation to negate possible explanation of Reaves' actions. *See Brewer v. Mele,* 267 Md. 437, 450, 298 A.2d 156, 164 (1972). In this connection, Reaves has presented no evidence to suggest that she had herself provided her explanation for her conduct until the criminal trial itself was held.[4]

**3.** Plaintiff has dismissed claims which she originally asserted for civil conspiracy and tortious interference with contract. She has also conceded that a claim which she asserted for wrongful discharge is foreclosed by *Adler v. American Standard Corp.,* 830 F.2d 1303 (4th Cir.1987).

**4.** Because plaintiff is unable to prove the element of lack of probable cause on her independent claim against Westinghouse, this Court need not decide two other questions raised by that claim: (1) whether Westinghouse, in referring to law enforcement authorities the information which it had obtained from its internal investigation, "initiated" the criminal proceedings against Reaves, *see* Restatement (Second) of Torts, Section 653, comment g (1977). *But cf. Safeway Stores, Inc. v. Barrack,* 210 Md. at 174, 122 A.2d at 460; *Nance v. Gall,* 187 Md. 656, 668, 50 A.2d 120, 125 (1946), *modified* 187 Md. 656, 51 A.2d 535 (1947); and (2) whether Westinghouse's reliance on its attorney in referring the information from its investigation to law enforcement authorities provides a complete defense to the claim. *See generally Kennedy v. Crouch,* 191 Md. 580, 587, 62 A.2d 582, 586 (1948); *Gladding Chevrolet, Inc. v. Fowler,* 264 Md. 499, 506, 287 A.2d 280, 286 (1972); Annotation, *Reliance on Advice of Prosecuting Attorney*

■ Plaintiff's malicious prosecution claim against Fuselier and her derivative *respondeat superior* claim against Westinghouse also fail. Plaintiff has produced no evidence on the summary judgment record to prove, as required, that Fuselier himself took any steps to institute or continue the criminal proceedings against Reaves. It was Westinghouse which referred its investigative information to law enforcement authorities, and there is no indication that Westinghouse acted at Fuselier's behest in doing so. It is true that at her criminal trial Reaves based her defense in substantial part upon her supervisors' alleged knowledge of the practice of altering blue slips. However, this does not prove in any way that he was the moving force behind the criminal prosecution against Reaves.

*False Arrest*

■ The tort of false arrest is predicated upon *knowing* misconduct. *See Newton v. Spence*, 20 Md.App. 126, 136, 316 A.2d 837, 843 (1974). Negligence or other mistake in providing incorrect information to lawful authorities does not give rise to liability. *See Fletcher v. High's Dairy Products Division of Capital Milk Producers Co–Operative, Inc.*, 22 Md.App. 71, 75, 321 A.2d 821, 824 (1974). Here, plaintiff has presented no evidence to suggest that Westinghouse, through Renninger who headed its investigation, knowingly gave any false information to the police. In fact, it appears undisputed that everything that Westinghouse told the police was true.

Reaves' false arrest claim against Fuselier (and its derivative respondeat superior claim against Westinghouse) fails for the same reason as does her similar malicious prosecution claim: there is no evidence whatsoever to show that Fuselier had any contact with the arresting officers.

*Defamation Claims*

In her complaint Reaves asserted a defamation claim against Westinghouse and Fuselier for unspecified statements made to her co-workers, the Howard County Police Department and "the general public at large." She also asserted a claim against Fuselier alone for the "position paper" which he submitted to Westinghouse officials during the course of Westinghouse's internal investigation. As fleshed out in the summary judgment papers, plaintiff's defamation claims are based upon statements made by Westinghouse officials to the Howard County police and upon Fuselier's position paper.

Any claim based upon statements made by Westinghouse officials to the Howard County police is time-barred. According to Reaves' deposition testimony, she learned that charges had been filed against her with the Howard County police on or about September 14 or 15, 1983. This suit was not filed until December 26, 1984. Therefore, it clearly was untimely. *See* Md.Cts. & Jud.Proc.Code Ann. Section 5–105 (1984). At least on the present record, however, it cannot be said that Reaves' claim based upon Fuselier's position paper is time-barred. Although that paper is dated August 15, 1983, Reaves alleges that she did not learn of it until it was produced in response to a discovery request which she filed in her criminal case on January 17, 1984. Reaves asserts that this is the first time that she learned that Fuselier had been "spreading lies" about her. Therefore, her claim remains viable under Maryland's "discovery rule." *See Poffenberger v. Risser*, 290 Md. 631, 636, 431 A.2d 677, 680 (1981); *Sears, Roebuck & Co. v. Ulman*, 287 Md. 397, 401, 412 A.2d 1240, 1242 (1980).[5]

as *Defense to Malicious Prosecution Action*, 10 A.L.R.2d 1215 (1950).

**5.** Reaves implicitly asserts—and defendants have produced no evidence to the contrary—that until she obtained a copy of Fuselier's position paper during the criminal discovery, she did not know that he had actually been placing blame upon her but had simply denied his own wrongdoing. If, in fact, she knew more than one year before this suit was filed that Fuselier was shifting blame from himself to her, her claim based upon the position paper might well be time-barred since, in that event, she would have been aware of the substance (if not of the details) of what he was saying about her. *Cf. Pyramid Condominium Association v. Morgan*,

Although, as indicated above, Reaves did not in her complaint assert against Westinghouse a claim based upon Fuselier's position paper, in her summary judgment papers she has indicated that she is now doing so. Assuming that this belated reframing of her pleadings is proper, Westinghouse is nevertheless entitled to summary judgment on the claim. It is true that it is generally held that an employer may be held liable for an act of defamation committed by its employee during the course of the latter's employment. *See, e.g., Lewis v. Accelerated Transport–Pony Express, Inc.*, 219 Md. 252, 255, 148 A.2d 783, 785 (1959); *Medical Mutual Liability Insurance Society v. Mutual Fire, Marine & Inland Insurance Co.*, 37 Md.App. 706, 716–17, 379 A.2d 739, 745 (1977). This case is different, however, from the cases in which that principle is ordinarily applied. If an employee makes a defamatory statement to an outside third person as to a matter falling within the general scope of his authority, the employer is held liable because the employee is acting for his employer. Likewise, an employer would properly be held liable for a defamatory statement made by one of its employees while *conducting* an internal investigation on the employer's behalf. However, when an employee is interviewed during the course of an internal investigation as a potential participant in the alleged wrongdoing, he is speaking in his personal capacity; although his responses may be in furtherance of his own interest in retaining his employment, they bear upon his individual responsibility and are not in furtherance of his employer's business. Common sense and public policy dictate that the employer not be held liable for what the employee says under those circumstances. Otherwise, an employer could never conduct an investigation of alleged wrongdoing without substantial risk of almost inevitable liability if, as here,

two employees are (at least after the fact) blaming one another for what occurred.[6]

Fuselier has also moved for summary judgment on the merits of the defamation claim. His motion is denied. The statements made in the employer-employee context are, as Fuselier argues, entitled to a conditional privilege. *See, e.g., Peurifoy v. Congressional Motors, Inc.*, 254 Md. 501, 512, 255 A.2d 332, 338 (1969); *Stevenson v. Baltimore Baseball Club, Inc.*, 250 Md. 482, 486, 243 A.2d 533, 538 (1968); *Exxon Corp. v. Schoene*, 67 Md.App. 412, 421, 508 A.2d 142, 147 (1986). However, if, as Reaves asserts, Fuselier knew of the falsity of the matters which he recited in his position paper, he clearly possessed the requisite malice to defeat the conditional privilege. Thus, factual matters are in dispute which must be resolved by trial.

*Intentional Infliction of Emotional Distress*

Reaves has asserted claims against both Westinghouse and Fuselier for intentional infliction of emotional distress. This Court has substantial question whether such a claim is properly cognizable where, as here, the wrongs of which a plaintiff complains are covered by traditional common law torts. The cause of action for the intentional infliction of emotional distress was judicially created to provide a remedy for a quite particular wrong which was irremediable prior to its creation: intentional mental abuse unaccompanied by physical contact or physical injury. Plaintiffs now routinely seek to expand the tort to encompass all similar misconduct. Judicial toleration of this practice is intellectually promiscuous and effectively undermines the public policies which have led to the definition of the elements of, and defenses to, traditional torts.

664 F.Supp. 216, 219 (D.Md.1986), *aff'd,* 823 F.2d 548 (4th Cir.1987).

**6.** Reaves contends that Westinghouse can be held liable because of what she characterizes as the incompetence of its investigation. However, it is well established that "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth" as is required to demonstrate malice. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332, 94 S.Ct. 2997, 3003, 41 L.Ed.2d 789 (1974). It follows, *a fortiori,* that a negligently conducted investigation cannot form the basis for a finding of malice.

In any event, the trial courts play a vital role in making a threshold determination of whether a valid claim for intentional infliction of emotional distress has been stated. *See Borowski v. Vitro Corp.,* 634 F.Supp. 252, 258 (D.Md.1986), *rev'd on other grounds,* 829 F.2d 1119 (4th Cir. 1987); *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 502 A.2d 1057, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986). Here, it is clear from the summary judgment record that plaintiff can prove neither sufficiently "outrageous" conduct nor sufficiently "severe" emotional distress to sustain her claim. *See generally Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977); *Hamilton v. Ford Motor Credit Co., supra,* 66 Md.App. at 60, 502 A.2d at 1064; *Dick v. Mercantile–Safe Deposit & Trust Co.,* 63 Md.App. 270, 276, 492 A.2d 674, 677 (1985).

*Violation of Section 1981*

Reaves has presented no evidence of intentional racial discrimination practiced by Westinghouse. Her Section 1981 claim is based upon an allegation that by discharging her, Westinghouse treated her more severely than it treated similarly treated white employees.[7] That simply is not true. Westinghouse has offered uncontroverted evidence that three white males whom Westinghouse determined had fraudulently obtained funds through misuse of the blue slip and purchase order procedures were discharged. Two of them were prosecuted, and the third was not prosecuted only because of the relatively small amount of money he had taken. On this evidence Reaves' Section 1981 fails as a matter of law. *See generally Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed. 2d 207 (1981).

A separate order effecting the rulings made in this memorandum is being entered herewith.

ORDER

For the reasons stated in the memorandum entered herein, it is this 3rd day of March 1988

ORDERED

1. Summary judgment is entered on behalf of defendant Westinghouse Electric Corporation against plaintiff as to all of the claims asserted against it; and

2. Summary judgment is entered on behalf of defendant Richard A. Fuselier against plaintiff as to all of the claims asserted against him except the claim for defamation based upon his "position paper" dated August 15, 1983.

---

7. Reaves also alleges that she was discharged because she filed charges of racial discrimination against Westinghouse with the EEOC and the Maryland Human Relations Commission. This contention is refuted by the fact that the investigation into Reaves' alleged criminal activity—the results of which unquestionably caused her discharge—began prior to the time that she filed her charges.