729 P.2d 408

**In the Matter of the General Determination of the Right to Use of Surface and Ground Water of the Payette River Drainage Basin.**

**James D. BRANSON and Martha Branson, Appellants,**

v.

**Gorman MIRACLE, Respondent.**

**No. 16149.**

Court of Appeals of Idaho.

Nov. 26, 1986.

---

Claude V. Marcus, Boise, for appellants.

Lloyd J. Walker, Twin Falls, for respondent.

WALTERS, Chief Judge.

This case involves an alleged prescriptive easement to maintain a water pipeline and its appurtenances. It is a sequel to a decision reported at 107 Idaho 221, 687 P.2d 1348 (1984), hereinafter referred to as "Branson I." In *Branson I* our Supreme Court affirmed Gorman Miracle's right to water flowing from a tunnel on James and Martha Bransons' mining claim. The Court remanded to the district court for a determination of Miracle's right to enter the Bransons' property to maintain the associated waterworks. On remand, the district court concluded that Miracle had established an easement by prescription for the purpose of maintaining and servicing the water collection system from the portal of the tunnel to the adjoining Miracle property.

The Bransons appeal, contending the district court's conclusion is unsupported by the evidence. Essentially, the issue presented in this case is as follows. Where the ownership of a dominant estate is transferred, does the continuous, notorious exercise by the transferee of an unrevoked permissive use granted to the transferor by

the owner of the servient estate convert the use into one of hostility, thus establishing the basis for a prescriptive easement? We hold that such a continuous use alone—without a finding that the transferee repudiated its license and actually or constructively communicated to the owner of the servient estate an intention to adversely and hostilely establish a prescriptive easement—will not support the conclusion that a prescriptive easement resulted. We reverse the judgment and remand the case for additional factual findings on the questions of repudiation and notice of a hostile claim.

The facts of this case relating to establishment of the water rights are set forth in *Branson I* and need not be repeated here. We are concerned only with an easement for access to enjoy the decreed rights. The easement involves a water transportation system across the Bransons' property. The exact origin of this system is lost in the mists of time. It appears that a pipe from the Bransons' mine to Miracle's property was first installed in about 1940 to supply water to miners residing in a cabin leased to the mining company by Miracle's predecessor in interest. The system remained in use when the cabin later was occupied by Miracle's predecessor.

According to the record, the waterworks initially consisted of a small pipe, with a screen-covered opening, extending approximately 200 feet from the mine's portal to the property now owned by Miracle. The mine tunnel originally reached approximately 400 feet into the hillside, but later was extended to 2,600 feet. Water collected from the stream flowing from the portal was transported, through a pipe, down the hill and allowed to overflow from a standpipe near the cabin on the Miracle property. In *Branson I*, the Supreme Court confirmed that this diversion was a valid appropriation of underground water to the extent the water was beneficially used.

In 1962, shortly before Miracle acquired title to the property, the cabin was destroyed by fire. At this time James Branson's father, Joe, who had participated in installation of the original system, was in possession of the mining claim. In 1964, Joe Branson added a second pipe at the portal to supply water to his own residence near the mine. Miracle replaced the destroyed cabin in 1965. He connected his new residence to the existing waterworks. According to the record, the source adequately supplied water for domestic use to both Miracle and the Bransons. In 1971, the pipe leading to Miracle's property became plugged, apparently due to poor maintenance. During the next year, Miracle installed a buried catch basin at the base of the mine's tailing pile to correct this problem. Notice of this change was not provided to the Bransons. This catch basin, which recovered the overflow from the mine and transported it to Miracle's residence, was also located upon the Bransons' mining claim. Joe Branson died in 1975.

Beginning in 1977, Jim Branson diverted the overflow at the portal of the mine toward the Branson residence and into a settling pond. Simultaneously, the mine entrance was blocked to limit access. Apparently this diversion dried up Miracle's water supply. In 1979, Miracle extended a new line up to the portal. Miracle testified in *Branson I*, and the Supreme Court evidently agreed, that all of these systems utilized the same underground source.

This litigation arose from the 1969 Payette River Basin water rights adjudication. Water right claims were filed by both Miracle and the Bransons in 1977. A dispute over these claims resulted in *Branson I*, where the Supreme Court affirmed the domestic water rights of both parties, plus a minimal mining-water right in the Bransons. However, the Court remanded the case because the district court had entered no findings in support of its conclusion that Miracle had a right of ingress and egress onto the Branson property for the purpose of maintaining the flow of water to his property.

On remand the district court took additional evidence on Miracle's easement claim. The court found:

While it appears that the entry onto the Branson property by the Miracles' predecessors in title to maintain the water collection system which serves the Miracle property was permissive, the Court finds that from the time the Miracles acquired title, and certainly for at least five years following the rebuilding or replacing of their abode, the Miracles' entry onto the Branson property to maintain the water system was open, exclusive and notorious under a claim of right, and that the Bransons had actual and implied knowledge of the notorious claim of the Miracles.

The court concluded:

[Miracle has] established a prescriptive easement on the Branson mining claim for the purpose of going upon the Branson property as may be necessary to maintain and service the water collection system at or near the mouth of the Branson mining claim and down to the Miracles' receiving area.

The Bransons argue that the court's finding was not supported by the evidence and that the court's conclusion is not adequately supported by the findings.

■ Private easements by prescription are disfavored in the law. *Lorang v. Hunt*, 107 Idaho 802, 693 P.2d 448 (1984). In *West v. Smith*, 95 Idaho 550, 557, 511 P.2d 1326, 1333 (1973), our Supreme Court held:

In order for a claimant to establish that he has acquired a private prescriptive easement by adverse use, he must submit "reasonably clear and convincing" proof of open, notorious, continuous, uninterrupted use, under a claim of right, with the knowledge of the owner of the servient tenement, for the prescriptive period. "Under a claim of right" signifies use without recognition of the rights of the owner of the servient estate. Thus, a prescriptive right cannot be acquired if the use of the land is with the permission of its owner. [Footnotes omitted.]

Ordinarily, proof of open, notorious, uninterrupted use for the prescriptive period of five years (I.C. § 5–203) raises a presumption that the use was adverse. *West v. Smith, supra.* Here, the Bransons successfully rebutted this presumption. The Bransons argued, and the district court found, that Miracle's use was initiated with the permission given to his predecessors in interest. Miracle has not attacked this finding. Nonetheless, the court found that the subsequent maintenance of the works by Miracle supported a prescriptive right.

■ A use initiated with permission may ripen into a prescriptive easement, where the permission is later repudiated or revoked. *Brandon v. Umpqua Lumber & Timber Co.*, 26 Cal.App. 96, 146 P. 46 (1914). Where initial permission has been proven the burden is on the claimant to show that the license or permission has been revoked or successfully repudiated. *Id.* Our Supreme Court has observed:

Absent unequivocal conduct giving the owner of the property notice of hostility and adverseness, we will not conclude that a use initiated with permission has somehow changed to one of hostility. Such a conclusion would tend to destroy the public interest of encouraging amicable relationships between neighbors.

*Lorang v. Hunt, supra* 107 Idaho at 804–805, 693 P.2d at 450–51 (1984). Other states describe the claimant's duty as requiring proof of a distinct and positive assertion of a right hostile to the owner of the property. *E.g., City of Anchorage v. Nesbett*, 530 P.2d 1324 (Alaska 1975); *Morrison v. Higbee*, 668 P.2d 1025 (Mont.1983); *Hester v. Sawyers*, 41 N.M. 497, 71 P.2d 646 (1937). *See generally* 2 G. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY, § 345 (1980) (hereinafter THOMPSON).

■ While acting pursuant to permission the claimant's rights are in the form of a license. Unless the licensor is estopped, a license is revocable at will. *West v. Smith, supra; Eliopulos v. Kondo Farms, Inc.*, 102 Idaho 915, 643 P.2d 1085 (Ct.App.1982). No interest in property vests in the licensee. THOMPSON § 223 at 222 (1980). Before a prescriptive right may be created,

the fact that the user claims a nonpermissive right, adverse to the rights of the servient estate owner must be brought to the knowledge of the owner of the servient estate. *Thompson v. Scott,* 270 Or. 542, 528 P.2d 509 (1974).

Because a license is personal to the licensee, some courts have found a transfer of the dominant or the servient estate alone is sufficient to repudiate or revoke the license. *E.g., Burkhart v. Zimmerman,* 239 Mich. 491, 214 N.W. 406 (1927). However our Supreme Court has rejected this approach where the servient estate is transferred.

> A revocable license may continue by implication even after the transfer or conveyance of the licensor's interest in the land, where the new owner makes no objection to the use and the licensee's continued enjoyment of the license is not inconsistent with the rights of the grantee or transferee.

*Cooper v. Boise Church of Christ of Boise, Idaho, Inc.,* 96 Idaho 45, 48, 524 P.2d 173, 176 (1974). *But see Stecklein v. Montgomery,* 98 Idaho 671, 570 P.2d 1359 (1977) (permission by prior owner did not rebut presumption of later adverseness). In *Webster v. Magleby,* 98 Idaho 326, 563 P.2d 50 (1977), the Idaho Supreme Court affirmed a trial court's finding that a transfer of the dominant estate combined with continued use was not sufficient to unequivocally notify the licensor that a use had become hostile and adverse.

■ We believe the burden on the claimant is not significantly affected by the fact that an easement is claimed by the successor-in-interest of the party to whom permission was given. *See Johnson v. Heglund,* 175 Minn. 592, 222 N.W. 272 (1928). It should not be necessary to reaffirm permission to each successive owner of the licensee's property. Once established, the character of the use continues until a change is brought to the attention of the licensor. Transfer or conveyance of the licensee's interest in the dominant estate does not rise to the "unequivocal conduct" necessary to repudiate the permission. Something more is required.

Thus, a licensee cannot begin an adverse use against his licensor merely by repudiating his license under such circumstances that the licensor has a reasonable opportunity to learn of the repudiation. Justice to the licensor requires more than this. It requires that he know of the repudiation. If knowledge does come to him the source is immaterial. It is not necessary that it come from the licensee, but the responsibility of seeing that it does come to him is on the licensee, a responsibility the obligation of which cannot be satisfied by showing that the licensor neglected to avail himself of means of knowledge.

5 RESTATEMENT OF PROPERTY § 458, comment j, 2933–34 (1944).

Miracle contends that he was unaware of any license or permission and thus could not be expected to knowingly repudiate it. He testified that following acquisition of the dominant estate he openly maintained and serviced the waterworks as if they were his by right. We believe the rule of *Lorang* requires not only that Miracle have a subjective claim of right, but that the adverseness of this claim have been brought to the knowledge of the Bransons by distinct and positive means. While it is not necessary to resort to violence in order to communicate to another party that a claim is adverse and hostile, neither is it sufficient to simply continue the use openly and notoriously. Continued use and occasional repairs of waterworks do not give notice of adversity if consistent with the permission granted to the user's predecessor. *Yeager v. Woodruff,* 17 Utah 361, 53 P. 1045 (1898). Although a substantial change or expansion from the permitted use might bring home to the servient owner that the premises are being used adversely, *Lindokken v. Paulson,* 224 Wis. 470, 272 N.W. 453 (1937), Miracle's testimony indicates that little more than maintenance was done during the initial period of his occupancy.

[MIRACLE'S COUNSEL]: You'd periodically see Mr. [Joe] Branson?

[MIRACLE]: Oh, yes.

[COUNSEL]: And periodically see him at the mine hole?

[MIRACLE]: He would come over practically every time we come up and visit. He was an old miner, and he had lots of miner's stories, and I enjoyed talking with the old gent. He visited back and forth.

[COUNSEL]: Was there anything hidden about what you were doing?

[MIRACLE]: No, absolutely not.

[COUNSEL]: Was there ever any discussion with Mr. [Joe] Branson about whether you had the right to do that, do what you were doing?

[MIRACLE]: No, absolutely not.

[COUNSEL]: You were just doing it?

[MIRACLE]: That's right.

■ Had Joe Branson appropriated all of the water for his own use, that appropriation could have acted as a revocation of the license. *See Eckerson v. Crippen*, 110 N.Y. 585, 18 N.E. 443 (1888). During the 1960's, Joe Branson apparently assisted in maintaining Miracle's system. The clogging of the line in the early 70's was attributed to Joe Branson's carelessness and ill health. A diversion of the entire supply did not occur until shortly before this action was commenced.

A few years later, when James Branson began diversion of the overflow and excavation at the portal, this litigation resulted. Regarding his communication with James Branson, Miracle testified as follows:

[MIRACLE'S COUNSEL]: During—after Mr. Branson, Sr.'s death, was there ever anything hidden about your utilization of the water or maintaining it?

[MIRACLE]: I had never saw Mr. Branson, Jim Branson here, until I saw him in court. I never saw him.

[COUNSEL]: But did you hide your activities?

[MIRACLE]: No.

[COUNSEL]: Were they out in the open?

[MIRACLE]: Certainly.

■ James Branson testified that he found Miracle's later improvements at the portal adverse to his mining interests. However this conflict became apparent at approximately the same time as this action was commenced. The adverse use must be for the full five-year period, following repudiation or revocation of any permission. *Hester v. Sawyers, supra.* We are unable to determine from the record the specific period of adverseness, if any.

The law encourages acts of neighborly courtesy. An adverse claimant must provide notice of hostility sufficient to warn the servient owner that the latter's property rights are at risk. A new owner may not simply assume that an appurtenant easement has been acquired with the property, but must determine the state of his title. This policy favors amicable relations between neighbors by requiring that the claimant establish repudiation of permission. Anything less would either discourage generosity between neighbors or force the owner of the servient estate to repeatedly reaffirm the permission at any hint of hostility or an adverse claim. Here, Miracle's initial use was consistent with that of a licensee. The district court made no specific findings regarding later revocation or repudiation of the license.

A lack of findings on a material issue affecting the judgment may be disregarded by the appellate court only if the record is clear and yields an obvious answer to the factual question. *Donndelinger v. Donndelinger*, 107 Idaho 431, 690 P.2d 366 (Ct. App.1984). Because the court's findings do not directly address the hostility element of Miracle's claim, we find it necessary to remand this case for findings on two questions of fact. First, was the hostility of Miracle's claim—necessary to repudiate the permission—actually or constructively communicated to the owner of the Branson mining claim? Second, if so, was the five-year period for a prescriptive easement established following that notice?

On remand, should the district court conclude that a prescriptive easement was not established, Miracle still has the option of proceeding by eminent domain pursuant to I.C. § 42–1106, as noted in *Branson I*.

Therefore, in any case, Miracle will not be cut off from his source of domestic water.

The judgment is reversed and the case is remanded to the district court for proceedings consistent with this opinion. Costs to appellants, Bransons.

BURNETT and SWANSTROM, JJ., concur.