33 A.3d 1055

Brenda RUPLI

v.

SOUTH MOUNTAIN HERITAGE SOCIETY, INC.

No. 2555, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Dec. 22, 2011.

**676**

Jacob I. Weddle (Gordon & Simmons, LLC, on the brief), Frederick, MD, for appellant.

Bethamy N. Beam, Frederick, MD, for appellee.

Panel: EYLER, DEBORAH S., MEREDITH and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

JAMES A. KENNEY, III (Retired, Specially Assigned), J.

At issue in this case is the continued use of a well that has supplied water to a neighboring property since before 1973. Appellant Brenda Rupli ("Rupli") appeals the grant by the Circuit Court for Frederick County of a motion for summary

judgment in favor of appellee, the Southern Mountain Heritage Society, Inc. ("SMHS"), and the denial of summary judgment in her favor. She presents four questions which we have rephrased and consolidated as follows: did the circuit court err in granting summary judgment in favor of SMHS? [1]

For the reasons that follow, we answer the question in the negative, and shall affirm the judgment of the circuit court.

## STATEMENT OF FACTS[2]

In 1965, Moran Enterprises, Inc. ("Moran Inc.") purchased the property at 1 E. Main Street, Burkittsville, MD ("the Rupli Property"). The property adjacent to the Rupli Property, 3 E. Main Street ("the Church Property"), was at that time owned by Resurrection Reformed Church of Burkittsville ("RRCB"). Some time prior to 1973, because the well on the Rupli Property was contaminated, RRCB granted Mr. Moran permission to use a well on the Church Property and to run

---

1. As presented in Rupli's brief, the questions are:
 1. Whether the Circuit Court erred in denying Ms. Rupli summary judgment and granting SMHS summary judgment when Ms. Rupli's use was presumptively hostile.
 2. If so, or in the alterative, whether the Circuit Court erred in denying Ms. Rupli summary judgment and granting SMHS summary judgment because the Circuit Court found that Ms. Rupli['s] use of the disputed Well was not hostile even though Ms. Rupli was not a party to the permissive agreement between her predecessor in interest and SMHS's predecessor in interest; Ms. Rupli has used the Well from 1973 to 2005 as a matter of right; Ms. Rupli used the disputed Well without express permission from SMHS or its predecessor in interest; Ms. Rupli maintained the working condition of the Well; and the SMHS asked Ms. Rupli for permission to use water from the Well.
 3. Whether the Circuit Court erred in granting SMHS summary judgment by deciding material questions of fact such as SMHS's subjective intent, i.e. SMHS's implicit "tolerance" of Ms. Rupli's use of the Well for more than 26 years.
 4. Whether the Circuit Court erred in granting SMHS summary judgment by summarily adjudicating only one of Ms. Rupli's defenses (prescriptive easement) when at least two other defenses—easement by estoppel and easement by necessity—remained to be adjudicated.

2. In their cross motions for summary judgment, the parties each submitted a statement of "undisputed" facts.

piping between that well and the house on the Rupli Property. This well provided water to the Rupli property throughout Moran Inc.'s ownership of the Rupli Property.

■ Rupli and her former husband, Mr. Rupli, purchased the Rupli Property from Moran in 1973.[3] At that time, Mr. Moran advised *Mr.* Rupli[4] that the well was used with permission from RRCB.[5]

In 1979, SMHS, a not-for-profit corporation, purchased the Church Property. At this time, SMHS knew of Rupli's use of the well, which continued after SMHS purchased the Church Property.

In 1998, Rupli approached SMHS with a deed of easement to the well on the Church Property, which she later described as an attempt to document "something she already had." SMHS did not sign the deed of easement and, on November 16, 2005, SMHS directed Rupli to disconnect from the well because it had decided to hold events at the church which would require indoor plumbing.[6] Rupli refused.

On September 14, 2009, SMHS filed an amended complaint in the Circuit Court for Frederick County seeking declaratory

---

3. Mr. Rupli transferred his interest in the Rupli Property to Rupli in 1998.

4. According to Rupli, SMHS alleges that "Mr. Moran communicated to *Ms.* Rupli that his use of the Well was by permission." (Emphasis added). But SMHS states that it *"does not contend* Mr. Moran advised *Ms.* Rupli that he had obtained permission to use the Church Well, nor does [SMHS] contend that [RRCB] expressly granted *Ms.* Rupli any such permission." (Emphasis added). "[T]he relationship of principal and agent between a husband and wife may not be implied from the marital status of the parties." *William Penn Supply Corp. v. Watterson,* 218 Md. 291, 296, 146 A.2d 420 (1958).

5. Rupli states in her motion for summary judgment that "[f]or the purposes of this Motion, [she] will assume the truth of" the allegations that Mr. Moran was granted permission, and that Mr. Moran communicated this permission to Mr. Rupli.

6. This was the first time that SMHS attempted to stop Rupli from using the well. In their respective statements of facts, the parties disagree as to whether this incident marked SMHS's withdrawal of "permission" or "acquiescence" to Rupli's use of the well.

relief with respect to use of the well (Count I), and to quiet title to the well (Count II). In each count SMHS requested that the court:

A. Determine and adjudicate the rights of the parties with respect to their legal right to access and use the Well located on the Church Property,

B. Declare that SMHS is entitled to the exclusive use of the Well on the Church Property,

C. Enjoin ... Rupli from any further use of the Well and from any further trespass onto the Church Property, including use of the Well and removal of water from the Well,

D. Require ... Rupli to remove all equipment from the Well that is designed to serve the Rupli Property,

E. Declare that ... Rupli is obligated to cooperate with SMHS and provide access to such portions of the Rupli Property from the Well on the Church Property,

F. Issue an award to SMHS of the costs of these proceedings, and

G. Grant SMHS such other relief as the nature of this cause and justice requires.

The parties filed cross-motions for summary judgment on both counts.

 On November 18, 2009, the court held a hearing on the motions for summary judgment, and on December 8, 2009, the court issued its "opinion and order" on the motions.[7] Harmonizing *Banks v. Pusey*, 393 Md. 688, 904 A.2d 448 (2006), with *Rau v. Collins*, 167 Md.App. 176, 891 A.2d 1175 (2006), the court reasoned that

---

7. Count 1 of the complaint requests "Declaratory Relief," and summary judgment was granted on Count 1 and Count 2. "While it is permissible to grant summary judgment in a declaratory judgment action where there is no genuine dispute of fact involved and the issues presented are solely questions of law, it is improper for the trial court simply to 'dismiss' the case without giving a declaration passing upon and adjudicating the issues raised in the proceeding." *Carroll County Education Asso. v. Board of Education*, 294 Md. 144, 155, 448 A.2d 345 (1982) (citations omitted). "[W]hen a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, 'the trial court must render a declaratory judgment.'" *Harford-*

[w]hile *Rau* clearly demonstrates that the grant of permission between RRCB and Moran terminated upon the disposition of the property, it does not demand that that transfer raised a presumption of adversity as a matter of law.... Thus, where initial permission has been proven the burden remains on the claimant to show via affirmative evidence how and when the license was repudiated.... Absent unequivocal conduct giving the owner of the servient property notice of adversity, this Court will not conclude that a use initiated with permission could transform into one defined by hostility. Such a conclusion would damage the public interest of encouraging amicable relationships between neighbors.

According to the circuit court, because the use of the well was "initiated with permission" to her predecessor in title, Rupli had the burden of proving adverse use with "affirmative evidence," which she did not satisfy.

In conclusion, the circuit court granted summary judgment in favor of SMHS, and further

**ORDERED** that [SMHS] is the sole owner of the Well and is entitled to the exclusive use of the Well on the Church Property, and further

**ORDERED** that [Rupli] is enjoined from any further use of the Well and from any further trespass onto the Church

---

*Mut. Ins. Co. v. Woodfin Equities Corp.*, 344 Md. 399, 414, 687 A.2d 652 (1997) (quoting *Christ v. Department*, 335 Md. 427, 435, 644 A.2d 34 (1994)). Although in this case the opinion and order does not state that it is a "declaratory judgment" or use the word "declare," *see infra* p. 708, 33 A.3d at 1076, it "clearly delineated" and specifically addressed the declaration requested. *Dart Drug Corp. v. Hechinger Co.*, 272 Md. 15, 29, 320 A.2d 266 (1974) (citations omitted); *Allstate Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 363 Md. 106, 117 n. 1, 767 A.2d 831 (2001). In any event, "[t]he failure to enter a proper declaratory judgment is not a jurisdictional defect," *Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 256, 969 A.2d 284 (2009), but rather is a "procedural error...." *Bushey v. Northern Assur. Co. of Am.*, 362 Md. 626, 651, 766 A.2d 598 (2001). In that situation, the appellate court "may, in its discretion, review the merits of the controversy and remand for the entry of an appropriate declaratory judgment by the circuit court." *Id.* We do not see the need to remand as such in this case.

Property, including use of the Well and removal of water from the Well, and further,

**ORDERED** that [Rupli] is required to remove all equipment from the Well that is designed to serve the Rupli property, and further,

**ORDERED** that [Rupli] shall cooperate with SMHS by providing access to such portions of the Rupli Property, and take such other steps as may be necessary, to facilitate the disconnection of the Rupli Property from the Well on the Church Property.[8]

## DISCUSSION

### Standard of Review

■ Maryland Rule 2–501 authorizes summary judgment where "there is no genuine dispute as to any material fact and ... the party in whose favor judgment is entered is entitled to judgment as a matter of law." "Although a summary judgment in a declaratory judgment action is the exception rather than the rule, circumstances may warrant the entry of a full or partial summary judgment." *Loewenthal v. Security Ins. Co.*, 50 Md.App. 112, 117, 436 A.2d 493 (1981).

We review a trial court's grant or denial of a motion for summary judgment *de novo* to determine whether a dispute of material fact exists, and whether the movant is entitled to judgment as a matter of law. *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 479, 914 A.2d 735 (2007). We do "not attempt to decide any issue of fact or credibility, but only whether such issues exist." *Eng'g Mgmt. Servs. v. Md. State Highway Admin.*, 375 Md. 211, 226, 825 A.2d 966 (2003). In so doing, we review "the same material from the record and

---

8. As related in the parties' briefs, in the spring of 2010, Rupli drilled a new well on her property, but the water from this well was not potable because it contains harmful contaminants including toluene. "Toluene is a cyclical hydrocarbon consisting of a phenyl group (a benzene radical) bonded to a methyl radical ($C[6]H[5]-CH[3]$)." *SmithKline Beecham Corp. v. Apotex Corp.*, 2005 WL 941671, *3 n. 11, 2005 U.S. Dist. LEXIS 5999, *12 n. 11 (E.D.Pa. Mar. 31, 2005) (citing Grant & Hackh's Chemical Dictionary at 491, 595).

decid[e] the same legal issues as the circuit court." *Lopata v. Miller,* 122 Md.App. 76, 83, 712 A.2d 24 (1998).

"When both sides file cross-motions for summary judgment ... the judge must assess each party's motion on its merits, drawing all reasonable factual inferences against the moving party," *MAMSI Life & Health Ins. Co. v. Callaway,* 375 Md. 261, 278, 825 A.2d 995 (2003) (citation omitted), but "it does not follow that the circuit court must grant one of the motions," *Callaway v. MAMSI Life & Health Ins. Co.,* 145 Md.App. 567, 580, 806 A.2d 274 (2002), *rev'd on other grounds,* 375 Md. 261, 825 A.2d 995 (2003), for the filing of "cross-motions for summary judgment is not dispositive of the absence of a genuine dispute of material fact." *Taylor v. NationsBank, N.A.,* 365 Md. 166, 174, 776 A.2d 645 (2001). But where the litigants file cross-motions for summary judgment *and there are no disputes of material fact,* "it is clear that one of these motions should be granted." *Cook v. Alexandria Nat'l Bank,* 263 Md. 147, 149, 282 A.2d 97 (1971). In this case, both parties agreed that there were no disputes of material fact.[9]

### *Did the Circuit Court Make Impermissible Factual Determinations?*

Rupli contends that "the Circuit Court improperly acted as the trier of fact, inappropriately decided [SMHS's] intent and motives in relation to permission, and incorrectly

---

**9.** At the motions hearing, the following exchange occurred:
 The Court: What's the material dispute as to fact?
 [SMHS]: Well, Your Honor, it's our contention that there is no material dispute of fact. That these are purely legal issues ... that the Court needs to resolve as opposed to a jury.
 The Court: Do you agree with that?
 [Rupli]: I do, Your Honor.
 The Court: Okay. Well that's why I said, because you said the pretrial, and I read these and I said I don't see any dispute as to any material fact. It looks like it's purely a legal issue.
 [SMHS]: We agree, Your, I agree, Your honor.
 [Rupli]: I agree as well.
 The Court: All right then. This case be, decided on the motions for summary judgment.

resolved inferences and factual disputes against [Rupli], the non-moving party." In support of these contentions, Rupli offers the circuit court's statement that SMHS "tolerated" Rupli's use of the church well: [10]

> [t]he Circuit Court's fact finding—that is, that ... Rupli's use of the Well since 1973 was permissive because [SMHS] subjectively tolerated her use—has poisoned its entire ruling. The Circuit Court accepted [SMHS's] allegations that it tolerated ... Rupli's usage of the Well as true (in the face of powerful, contrary inferences), and substituted its judgment for that of the jury. Indeed, the Circuit Court usurped the jury's preliminary function—to weigh the evidence and to make factual findings. The Circuit Court, in essence, transformed the summary judgment procedure into a bench trial.

We are not persuaded that the circuit court's statements that SMHS "tolerated" Rupli's use of the well constituted an impermissible finding of fact. *See Eng'g Mgmt. Servs. v. Md. State Highway Admin.*, 375 Md. 211, 226, 825 A.2d 966 (2003). Rather, looking at the opinion as a whole, the court's use of this term arose out of its *legal* conclusion that Rupli's use of the well was presumptively permissive, and Rupli failed to proffer facts that would be legally sufficient to rebut this presumption. *See Zimmerman v. Summers*, 24 Md.App. 100, 106, 330 A.2d 722 (1975) (quoting *Cox v. Forrest*, 60 Md. 74, 80 (1883)) ("[A]n adverse right of an easement cannot grow out of a mere permissive enjoyment, the real point of distinction being between a *permissive or tolerated* user, and one which is claimed as a matter of right.") (emphasis added). The court did not, so to speak, "put the cart before the horse."

### Prescriptive Easement

"A prescriptive easement arises when a party makes an adverse, exclusive, and uninterrupted use of another's real

---

10. SMHS, in its complaint and motion for summary judgment, stated that it "continued to permit" Rupli's use of the well until 2005. Rupli, in her cross-motion, stated that SMHS did not "permit" her use, but rather "acquiesced" to it.

property for twenty years." *Kirby v. Hook,* 347 Md. 380, 392, 701 A.2d 397 (1997) (citations omitted). In her motion for summary judgment, Rupli states that "[t]here is no genuine dispute that [she]" has: (1) used the Church Property for at least twenty years, (2) used the Church Property "exclusively" during this period;[11] (3) used the Church Property "uninterrupted" during this period;[12] and (4) used the property "adversely" during this period. SMHS did not dispute Rupli's claims of actual exclusive and uninterrupted use, but, regarding Rupli's fulfillment of the twenty year period, it states that "[Rupli] failed to put [SMHS] on notice prior to November 1998 that her use was adverse.... [T]herefore, her adverse use began as early as 1998, but has not continued for 20 years."

### *Adverse Use* [13]

Rupli asserts that the circuit court erred in not finding her use of the well to be adverse as a matter of law

---

**11.** "By *exclusive,* the law does not mean that the right of way must be used by one person only, because two or more persons may be entitled to the use of the same way, but simply that the right should not depend for its enjoyment upon a similar right in others, and that the party claiming it exercises it under some claim existing in his favor, independent of all others. It must be exclusive as against the right of the community at large." *Zimmerman,* 24 Md.App. at 106, 330 A.2d 722 (quoting *Cox,* 60 Md. at 80).

**12.** " '[A]*n uninterrupted and continuous enjoyment*' " does not mean "that a person shall use the way every day for twenty years, but simply that he exercises the right more or less frequently, according to the nature of the use to which its enjoyment may be applied, and without objection on the part of the owner of the land, and under such circumstances as excludes the presumption of a voluntary abandonment on the part of the person claiming it." *Cox,* 60 Md. at 80 (emphasis in original).

**13.** The chart below outlines potential twenty year periods during which Rupli's allegedly adverse use of the well could begin and end. The years in the third column are approximate, and the request for a deed in 1998 could potentially serve as either a start date, *see supra,* or as an end date. In its brief, SMHS states that the request for a deed of easement in 1998 could constitute Rupli's "acknowledgment that [SMHS] had the right to cut off her use of the Well, thereby defeating

and not awarding her an easement by prescription. As stated in *Kirby*, 347 Md. at 392, 701 A.2d 397,

> [a]n easement is a nonpossessory interest in the real property of another. An easement can be created expressly or by implication. One form of implied easement is an easement by prescription. A prescriptive easement arises when a party makes an adverse, exclusive, and uninterrupted use of another's real property for twenty years.

(Internal citations omitted). In the absence of an express grant, the burden is on the party seeking the easement to

her claim of right." *See Zimmerman*, 24 Md.App. at 112, 330 A.2d 722 (citing 4 Tiffany, THE LAW OF REAL PROPERTY, § 1204 (3d ed. 1939)) ("When, by asking for permission, a person using the land of another recognizes the right of the owner to stop the use, then its character ceases to be adverse.").

| Potential adverse use start date | Potential end date | Satisfied? |
|---|---|---|
| 1973 (conveyance of Rupli Property to Rupli) | A. 1998 (request for deed)<br><br>B. 2005 (request to disconnect from well) | A. Yes (25 years)<br><br>B. Yes (32 years) |
| 1979 (conveyance of Church Property to SMHS) | A. 1998 (request for deed)<br><br>B. 2005 (request to disconnect from well) | A. No (19 years)<br><br>B. Yes (26 years) |
| 1998 (request for deed) | 2011 | No (13 years) |
| 2005 (request to disconnect from well) | 2011 | No (6 years) |

establish the elements of prescriptive use. *Cox*, 60 Md. at 79. But

> [w]here one ... has used a right of way for twenty years unexplained, it is but fair to presume the user is under a claim of right.... In other words, the use of a way over the lands of another whenever one sees fit, and without asking leave, is an adverse use, and the burden is upon the owner of the land, to show that the use of the way was by license or contract inconsistent with a claim of right.

*Id.* at 79–80. *See also Kirby*, 347 Md. at 392, 701 A.2d 397 (citing *Condry v. Laurie*, 184 Md. 317, 321, 41 A.2d 66 (1945)) ("When a person has used a right of way openly, continuously, and without explanation for twenty years, it is presumed that the use has been adverse under a claim of right. The burden then shifts to the landowner to show that the use was [not adverse, but rather] permissive."). In a situation where "use begins adversely," the servient owner's "[m]ere failure to protest is not permission but acquiescence." *Mavromoustakos v. Padussis*, 112 Md.App. 59, 73–74, 684 A.2d 51 (1996) (quoting *Dalton v. Real Estate & Improvement Co.*, 201 Md. 34, 50, 92 A.2d 585 (1952)). To establish permission, failure to protest must be combined "with other indications of permission." *Id.* at 74, 684 A.2d 51.

But a presumption of adversity "will not arise if the use ... *appears to have been by permission*," *Banks v. Pusey*, 393 Md. 688, 700, 904 A.2d 448 (2006) (citing *Cox*, 60 Md. at 79) (emphasis in original), *i.e.*, where any "appearance of permission permeates the record." *Id.* at 701, 904 A.2d 448. "In the absence of ... a presumption of adverse use, the burden of establishing such use is on the party claiming it. This logically follows the general rule that the creation of an easement by prescription is not favored by the law." *Id.* (citing 3 Herbert T. Tiffany, THE LAW OF REAL PROPERTY, § 796 (3d ed.1939, 2006 Supp.)).

The *Banks* Court stated that the character of the initial use, whether "originally permissive or of right is presumed to continue." *Id.* at 709, 904 A.2d 448 (quoting *Feldstein v.*

*Segall,* 198 Md. 285, 295, 81 A.2d 610 (1951)). That the character of the initial use is presumed to continue is consistent with the long-held principle "that where the original entry and subsequent occupancy of land was . . . with the consent or permission of the owner, the possession would not be hostile or adverse and could not evolve into a subsisting title on which recovery could be had. . . ." *Id.* at 710, 904 A.2d 448 (quoting *Hungerford v. Hungerford,* 234 Md. 338, 341, 199 A.2d 209 (1964)). For use which is permissive in its inception to become adverse, "there must be affirmative evidence of change" offered by the party seeking the prescriptive easement. *Feldstein,* 198 Md. at 295, 81 A.2d 610. *See also* 1931 Herbert T. Tiffany, THE LAW OF REAL PROPERTY, § 503 (enlarged ed. 1920) ("[I]f the possession was originally not adverse to the true owner, the statute cannot be set in motion against him until the possessor has changed the *character of the possession* by a denial of the title of such owner, and such change has been brought to the knowledge of the latter.") (emphasis added).

SMHS observes that "[t]his case turns entirely on the legal questions of which party is entitled to a presumption and whether the other party can offer sufficient evidence to rebut the countervailing presumption." Because we essentially agree, we will first address who had the benefit of the controlling presumption.

According to Rupli, "[t]he legal underpinnings of SMHS's motion—that[, under *Banks,*] originally permissive use of land is presumed to continue until there is affirmative evidence of change to adverse use—*only holds true when dealing with the original parties to the permissive use agreement.*" (Emphasis added). In Rupli's view, the presumption of permissive use would terminate upon the sale of *either the dominant or servient estate.* In this case, both estates were sold—the dominant estate in 1973 and the servient estate in 1979—subsequent to the permissive use agreement between Moran Inc. and RRCB. Therefore, according to Rupli, SMHS had the burden of rebutting the presumption of her adverse use of the Church Property.

SMHS counters that *Banks,* which cited heavily from *Hungerford* and *Feldstein,*

> did not make any distinction between whether the actual claimant or the claimant's predecessor initiated the use, nor did it impose any requirement that the original user of the servient estate be the ultimate claimant. Rupli's attempt to differentiate her use 'as the claimant' from her predecessor's use is a distinction without difference and is not supported by Maryland law.

In other words, according to SMHS, the character of the use is determined when the use is initiated and the presumption of permissive use does not change with the sale of either estate.

In *Banks,* beginning in 1939, the Pusey family, including father and son, lived on a large property consisting of two parcels. In 1954, the father deeded one parcel to his son, but kept the other, which included a farm lane connecting the two. In 1979, the father died, and the father's parcel passed by deed to his wife, and, upon her death in 1995, to his grandchildren. In 1998, the Banks family purchased the father's parcel from the grandchildren. Despite owning his own parcel since 1954, the son had continued to live with his family on his father's parcel until 1995, and had continued to use the farm lane over that parcel until at least 1998. The son filed a complaint alleging that he held a prescriptive easement across the father's parcel, including the farm lane to access a public road. Reversing the circuit court's finding that the son "has the right to use the farm lane in question under the theory of easement by prescription," 393 Md. at 698, 904 A.2d 448, the Court of Appeals observed that "the parties do not dispute that the [son] made exclusive and uninterrupted use of the farm lane for a period in excess of twenty years," for the son "lived on what is now the Banks' property from approximately 1939 when he was a minor until 1998 and from 1954 [ ] on he . . . used the farm lane to access his 127 acre-parcel of land," both dates being more than 20 years *before* the 1998 conveyance of the father's parcel to the Banks family. *Id.* at 699, 904 A.2d 448. The court also stated,

[w]hat is primarily disputed ... is whether [the son's] use of the farm lane was adverse during the period of time that he resided with his parents on what is now the Banks' property. If [the son's] use of the farm lane was not adverse during the relevant period of time that he resided on his parents' property then, even if *arguendo* the use became adverse once the Banks obtained the property, it would not satisfy the required twenty-year time period.

*Id.* at 699–700, 904 A.2d 448.

In *Hungerford,* in 1899 a farm was conveyed to Nathaniel Hungerford, Sr. for life with remainder to two of his sons, Nathaniel Jr. and Henry. In 1922, Henry "staked out a lot on the farm, which Henry orally agreed to convey to" a third son, William, "in exchange for William's promise to perform certain labor or work for the life tenant." 234 Md. at 339, 199 A.2d 209. William took possession of the lot, constructed a dwelling, and lived there without disturbance. Nathaniel Sr. died in 1935, and Nathaniel Jr. and Henry held the farm as tenants in common until 1944, when they partitioned it by deed into two twenty-five acre parcels. Henry died in 1957, at which time his parcel passed to his wife, Susie. Henry had refused to convey the parcel to William, "before Henry's interest became possessory ... after the death of [Nathaniel Sr.] and before the death of Henry in 1957...." *Id.* at 341, 199 A.2d 209. Susie also refused to convey the parcel to William after her husband's death.

William filed a bill of equity to quiet and confirm title based on adverse possession. The circuit court found in favor of William, but the Court of Appeals reversed. Observing that "an original permissive possession is presumed to continue," the court reasoned that William's "repeated demands clearly indicate the [he], instead of claiming title as a matter of right by adverse possession, never ceased to recognize the continuance of the legal title in Henry and [Susie]." *Id.*

In *Feldstein,* the Millers, in 1918 purchased from the trustee of Henry Lammers's estate two parcels identified as 3904 and 3906 Eastern Avenue, which were burdened with a ten foot wide easement. That same year, the Habersacks pur-

chased from the trustee two parcels identified as 3908 and 3910 Eastern Avenue, which were benefitted by the easement. The Habersacks leased 3910 Eastern Avenue to the Crouchers. With permission of the Millers, the Habersacks and the Crouchers used more than the ten foot easement area. The Millers, in 1944, conveyed 3904 and 3906 Eastern Avenue to the Segalls, and, in 1946, the Habersacks conveyed 3908 and 3910 Eastern Avenue to the Feldsteins. The Feldsteins claimed a prescriptive easement based on the Habersacks' and the Crouchers' use of land outside of the designated easement, and argued "that in determining whether or not they have established a widened right of way by prescription, their own use since 1946 may be tacked to the use by their predecessors in title, Habersack and Croucher...." 198 Md. at 294, 81 A.2d 610. The Court stated,

[w]e *do not find it necessary to pass upon this contention.* If Habersack and Croucher, at the time of their deed to plaintiffs, had by prescription acquired a consummate right of way, their deed, and the appurtenance clause in it, is sufficient to convey such a right of way. If at the time of their deed, they had not acquired a prescriptive right of way, tacking plaintiffs' use from January, 1946 to September, 1947 would not establish such a right of way. If the evidence does not show adverse, exclusive and continuous use for twenty years before January, 1946, then there is no evidence to show such use for twenty years before September, 1947.

*Id.* at 294–95, 81 A.2d 610 (emphasis added). The Court held that the Habersacks and the Crouchers—and thus the Feldsteins—had not acquired a prescriptive easement because the original use of the expanded area was permissive, and thus the subsequent use by the Feldsteins was presumed to be permissive as well.

*Banks,*[14] *Hungerford,* and *Feldstein* did not expressly address whether the transfer of the dominant or servient estate,

---

**14.** In *Banks,* the Court stated, "even if *arguendo* the [son's] use became adverse once the Banks obtained the property, it would not satisfy the

or both, would convert a permissive use into an adverse use.[15] In *Banks* and *Feldstein* the original licensees and licensors did not transfer their properties *during the relevant twenty year period,* and in *Hungerford* there was no transfer at all.

▉▉▉▉ "The distinction between an easement and a mere license to use land is clear. While an easement implies an interest in land, a license is merely a personal privilege to do some particular act or series of acts on land without possessing any estate or interest therein." *Condry v. Laurie,* 184 Md. 317, 320, 41 A.2d 66 (1945) (citations omitted). A license may be revoked expressly, "at the pleasure of the party making it," *Rau v. Collins,* 167 Md.App. 176, 192, 891 A.2d 1175 (2006), or implicitly, "by the transfer of ownership *of either the land subject to the license or the land for the benefit of which the license was given.*" *Zimmerman v. Summers,* 24 Md.App. 100, 124, 330 A.2d 722 (1975) (emphasis added). *See also Rau,* 167 Md.App. at 192, 891 A.2d 1175 (license is revoked by sale of licensor or licensee's property). Even if, as SMHS contends, these statements are dicta in *Rau* and *Zimmerman,* the implicit revocation of a license upon the sale of the servient or dominant property, or both, is a well-established rule in Maryland. *See Shipley v. Fink,* 102 Md. 219, 228, 62 A. 360 (1905) (citing *Carter v. Harlan,* 6 Md. 20 (1854)) (license "is in fact revoked by sale and conveyance" of the licensor's property); *Baltimore v. Brack,* 175 Md. 615, 621, 3 A.2d 471 (1939) (affirming *Carter* and *Shipley* ); *Busada v. Ransom Motors, Inc.,* 31 Md.App. 704, 705, 358 A.2d 258 (1976) (quoting with approval the above language from *Zimmerman* ); *De Haro v. United States,* 72 U.S. 599, 627, 5 Wall. 599, 18 L.Ed. 681 (1867) (a license is "limited to the original

---

required twenty-year time period." 393 Md. at 700, 904 A.2d 448 (emphasis in original).

**15.** In none of these cases was it claimed that the transfer of the servient or dominant estate *to another family member* via deed or will would convert a permissive use into an adverse use. As that question is neither before us in this case, nor argued by Rupli, we decline to address it.

parties to it") (quoted in *Condry v. Laurie*, 184 Md. 317, 320, 41 A.2d 66 (1945)); 1219–20 Herbert T. Tiffany, THE LAW OF REAL PROPERTY, § 349 (enlarged ed.1920) (license terminates "by reason of the land having passed into the hands of a person other than the licensor" or the licensee).

In some states, an implicit revocation alone by transfer of the servient or dominant estate triggers a presumption that subsequent use is adverse. Of these, some have found that the conveyance of the *servient* property triggers a presumption. *See First Nat'l Bank v. Vanden Brooks*, 204 Mich. 164, 178, 169 N.W. 920 (1918) (license was extinguished after sale of servient premises, and upon subsequent use the prescriptive period "would begin to run"); *Burkhart v. Zimmerman*, 239 Mich. 491, 214 N.W. 406 (1927) (conveyance of servient land ended license for use of stairway; defendant's use thereafter was adverse); *Foley v. Lyons*, 85 R.I. 86, 125 A.2d 247 (1956) (conveyance of servient estate terminated oral license; later use was adverse); *Kruvant v. 12–22 Woodland Ave. Corp.*, 138 N.J.Super. 1, 12, 350 A.2d 102 (Law Div.1975) (decisions of *First Nat'l Bank, Foley,* and others "are consistent with the law of New Jersey"); *Miller v. Anderson*, 91 Wash.App. 822, 825, 964 P.2d 365 (1998) ("Use that is permissive at its inception is presumed to remain permissive unless proof exists of . . . the sale of the servient estate"). As stated in *Burkhart*, 239 Mich. at 494, 214 N.W. 406,

[i]t is in a sense a hard rule, for it requires the purchaser of land in which some right by another is being enjoyed by permission of the former owner, in order to prevent him by continued use from acquiring a vested right therein, to take some action in informing him that he may continue such enjoyment as a matter of favor, or to prohibit further use entirely. On the other hand there is no great hardship in a rule that requires a purchaser of land to take notice of any possession or use of it by a stranger. He is put upon inquiry as to the character and extent of the use, and if he fails to make it and act if necessary, he cannot complain if the user, after a period of years, acquires permanent rights in his property.

In Pennsylvania, conveyance of *either* estate will trigger the presumption of adverse use. *See Orth v. Werkheiser,* 305 Pa.Super. 576, 451 A.2d 1026 (1982) (sale of dominant or servient estate terminates license; use thereafter presumed hostile); *Sterner v. Freed,* 391 Pa.Super. 254, 570 A.2d 1079 (1990) (same). According to *Orth,* 305 Pa.Super. at 581, 451 A.2d 1026, for these purposes it is "immaterial" whether it is the dominant or the servient estate which is sold.

But, as we shall explain, other states disagree that the transfer of either the servient or dominant estate, or both, triggers the presumption of adverse use. While recognizing an implicit revocation of a license upon the sale of either estate as a well-established rule, *see* 1219–20 Herbert T. Tiffany, THE LAW OF REAL PROPERTY, § 349 (enlarged ed.1920), these states hold that the presumption of *permissive* use continues so long as the servient estate is used as it was before by the original licensee, sometimes referring to it as an implicit continuation of the license. *See, e.g., Cooper v. Boise Church of Christ,* 96 Idaho 45, 48, 524 P.2d 173 (1974) ("a revocable license may continue by implication").

More specifically, some states do not agree that the sale of the *servient* estate triggers a presumption of adverse use. *See Bennett v. Biddle,* 150 Pa. 420, 425, 24 A. 738 (1892) ("[A] change in the ownership of [the servient estate] did not necessarily . . . convert a use that had previously been permissive . . . into an adverse and hostile use."); *Baynard v. Every Evening Printing Co.,* 9 Del.Ch. 127, 144, 77 A. 885 (1910) ("mere conveyance of the legal title to the servient tenement will not render the subsequent user *ipso facto* adverse"); *Bracht v. Johnson,* 187 Mo.App. 220, 173 S.W. 692 (1915) (license to use land was held to continue where new owner made no objections to the use); *Sturnick v. Watson,* 336 Mass. 139, 142, 142 N.E.2d 896 (1957) (while the sale of the servient estate may have terminated the license, "it does not follow that, if the licensee continues to use the land as before, such use is necessarily adverse to the new owner."); *City of Anchorage v. Nesbett,* 530 P.2d 1324, 1330 (Alaska 1975) ("[C]ontinued use by a licensee after transfer of the servient parcel is

not necessarily adverse to the new owner."); *Cooper v. Boise Church of Christ,* 96 Idaho 45, 48, 524 P.2d 173 (1974) ("a revocable license may continue by implication even after the transfer or conveyance of the licensor's interest in the land, where the new owner makes no objection to the use"); *Moore v. Fuller,* 2002 WL 31236117, 2002 Me.Super. LEXIS 131 (Sept. 7, 2002) (although generally a license terminates with the conveyance of the servient estate, licensee cannot claim use thereafter is inherently adverse); *Newman v. Michel,* 224 W.Va. 735, 688 S.E.2d 610 (2009) (affirming trial court's conclusion that despite the transfer of the servient property, use of land that began with permission is presumed to so continue).

Other states do not agree that the sale of the *dominant* estate, or both estates, triggers a presumption of adverse use. *See Branson v. Miracle,* 111 Idaho 933, 937, 729 P.2d 408 (Idaho Ct.App.1986) ("Transfer or conveyance of the licensee's interest in the dominant estate does not ... [by itself] repudiate the permission."); *Gerberding v. Schnakenberg,* 216 Neb. 200, 204, 343 N.W.2d 62 (1984) ("The general rule is that if a use begins as a permissive one, it retains that character until notice that the use is claimed as a matter of right is communicated to the owner of the servient estate. This rule is not affected by the transfer of either the licensee's or licensor's title"); *Miller v. Anderson,* 91 Wash.App. 822, 829–30, 964 P.2d 365 (1998) (sale of dominant estate alone does not terminate presumption of permissive use); *Zabaneh v. Dan Beard Assocs., LLC,* 105 Conn.App. 134, 148, 937 A.2d 706 (2008) (a court is not "legally obliged to find that [a] license [is] implicitly revoked upon sale" of the dominant property).

In those states where the transfer of either the servient or dominant estates, or both, does not trigger a presumption of adverse use, and the presumption of permissive use continues, the party seeking the prescriptive easement must provide the owner of the servient estate "some notice that an adverse claim is being made," *Miller,* 91 Wash.App. at 830, 964 P.2d 365, such as "unequivocal conduct giving the owner of the property notice of hostility and adverseness," *Branson,* 111

Idaho at 936, 729 P.2d 408 (citation omitted), or a "distinct and positive assertion of a right hostile to the owner of the property." *Glover v. Glover*, 92 P.3d 387, 392 (Alaska 2004).

Our review of the jurisprudence helps frame the question in this case: when a license is revoked by implication by the sale of the dominant or servient estate, or both, is the continued use of the property, when it is used as it was before, presumed to be adverse or presumed to be permissive? Our analysis has as its underlying premise "the general rule that the creation of an easement by prescription is not favored by the law." *Banks v. Pusey*, 393 Md. 688, 701, 904 A.2d 448 (2006) (citing 3 Herbert T. Tiffany, THE LAW OF REAL PROPERTY, § 796 (3d ed.1939, 2006 Supp.)), and finds support in a corresponding rule that "use originally permissive or of right is presumed to continue...." *Id.* at 709, 904 A.2d 448 (quoting *Feldstein v. Segall*, 198 Md. 285, 295, 81 A.2d 610 (1951)).

Guided by these principles, we are persuaded that, notwithstanding the revocation by implication of the license following the conveyance of the servient or dominant estate, or both, if the original possession is not adverse, the presumption of permissive use continues in the absence of affirmative evidence that the character of the use has changed. *See* 1931 Herbert T. Tiffany, THE LAW OF REAL PROPERTY, § 503 (enlarged ed. 1920) ("[I]f the possession was originally not adverse to the true owner, the statute cannot be set in motion against him until the possessor has changed the character of the possession by a denial of the title of such owner, and such change has been brought to the knowledge of the latter."); *cf. Sturnick v. Watson*, 336 Mass. 139, 142, 142 N.E.2d 896 (1957) (after sale of an estate, "it does not follow that, if the licensee continues to use the land as before such use is necessarily adverse to the ... owner."). To rebut the presumption of permissiveness, "there must be affirmative evidence of change" proffered by the dominant party. *Feldstein*, 198 Md. at 295, 81 A.2d 610. "If possession is permissive in the beginning, it can be changed to one of hostility only by the most unequivocal conduct on the part of the adverse claimant,"

10 THOMPSON ON REAL PROPERTY § 87.10, at 137 (David E. Thomas, ed., 2d ed.1998), "something more than bad manners and unneighborly conduct." *Feldstein,* 198 Md. at 296, 81 A.2d 610.

As to the transfer of the dominant estate, the policy considerations offered by the Court of Appeals of Washington to support the rule that use remains presumptively permissive are instructive:

> [t]his rule both protects the expectations of the property owner who grants permission and encourages cooperation between neighboring landowners. We do not believe that an owner who gives his neighbor permission to use his land should be required to monitor any and all transfers of his neighbor's estate to insure that his permission is not extinguished. Many kinds of transfers will give no notice to the world. For example, if the neighbor transfers title but remains in residence, even a vigilant owner of the servient estate may have no knowledge of the transfer. One who grants permission to his neighbor should not be required to question the status of his neighbor's title in order to make sure that his permission has not been terminated and a potentially adverse use created by operation of law....
> [T]he rule should protect and encourage the person granting the permission. He is not well served by a rule that may effectively withdraw the permission without his knowledge, and cause him to lose his property.

*Miller v. Anderson,* 91 Wash.App. 822, 830–31, 964 P.2d 365 (1998). Similarly,

> [t]he law encourages acts of neighborly courtesy. An adverse claimant must provide notice of hostility sufficient to warn the servient owner that the latter's property rights are at risk. A new [dominant estate] owner may not simply assume that an appurtenant easement has been acquired with the property, but must determine the state of his title. This policy favors amicable relations between neighbors by requiring that the claimant establish repudiation of permission. Anything less would either discourage generosity

between neighbors or force the owner of the servient estate to repeatedly reaffirm the permission at any hint of hostility or an adverse claim.

*Branson v. Miracle,* 111 Idaho 933, 938, 729 P.2d 408 (Idaho Ct.App.1986).

In the case of an implied presumption of adverse use upon the sale of the servient estate, *Burkhart v. Zimmerman* recognizes that such a rule

> is in a sense a hard rule, for it requires the purchaser of [the servient] land in which some right by another is being enjoyed by permission of the former owner, in order to prevent him by continued use from acquiring a vested right therein, to take some action in informing him that he may continue such enjoyment as a matter of favor, or to prohibit further use entirely.

239 Mich. 491, 494, 214 N.W. 406 (1927). Moreover, we fail to see how terminating the presumption of permissive use upon the transfer of the servient property supports "[t]he policy behind the acquisition of property rights by prescription[:]" punishing a *"negligent* owner." *Hoffman v. United Iron & Metal Co.,* 108 Md.App. 117, 138, 671 A.2d 55 (1996) (quoting *Hanson v. Johnson,* 62 Md. 25, 31 (1884)) (emphasis added).

*Did The Circuit Court Fail to Consider Other Arguments?*

Rupli alleges,

> [i]n finally adjudicating the case ... the Circuit Court implicitly rejected [her] other defenses which could have resulted in a judgment in her favor. For example, [Rupli's] cross-motion for summary judgment notes that she could be granted an easement by estoppel. Furthermore, [Rupli] asserted the related defenses of estoppel, laches and acquiescence in her Answer. The Circuit Court, however, implicitly rejected these defense[s] without considering evidence or hearing argument on the same.

The easement by estoppel argument was mentioned only as a one line footnote in Rupli's cross-motion for summary judgment. In a motion for summary judgment, "[t]he moving

party shall state *with particularity* all reasons why the motion should be granted." Md. Rule 2–519(a) (emphasis added). Laches was not asserted in Rupli's cross-motion for summary judgment, and neither estoppel nor laches was discussed in her memorandum in opposition to SMHS's motion for summary judgment. The defense of acquiescence was necessarily rejected by the circuit court's determination that Rupli's use of the well began permissively and the presumption of permissive use continued.[16]

### Has An Easement By Necessity Subsequently Arisen?

■■■■■ Rupli alleges that an easement by necessity [17] has arisen subsequent to the circuit court's ruling on summary judgment. Averring that "the issue of contamination was squarely recognized by the Circuit Court at the summary judgment hearing," Rupli claims we should entertain this issue on appeal. However, the issue of contamination as addressed by the circuit court was that of the contamination of the existing well on the Rupli Property, not the new well which Rupli has drilled. Although we may consider new arguments on appeal under Maryland Rule 8–131, we decline to exercise that discretion on these facts.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

16. *See Mavromoustakos v. Padussis,* 112 Md.App. 59, 73–74, 684 A.2d 51 (1996) (quoting *Dalton v. Real Estate & Improvement Co.,* 201 Md. 34, 50, 92 A.2d 585 (1952)) ("*[W]hen a use begins adversely* ... [m]ere failure to protest is not permission but[, rather,] acquiescence.") (emphasis added).

17. Easements by necessity typically arise "[w]here a grantor conveys a tract of land which has no outlet to a public highway except over his remaining land or over that of a stranger, a way of necessity over the grantor's remaining property will be implied." *Mullins v. Ray,* 232 Md. 596, 599, 194 A.2d 806 (1963). "The doctrine is based upon public policy, which is favorable to full utilization of land and the presumption that parties do not intend to render land unfit for occupancy." *Condry v. Laurie,* 184 Md. 317, 321, 41 A.2d 66 (1945).